# In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

Nos. 04-2359 & 04-2681

RYDER TRUCK RENTAL, doing business
as RYDER TRANSPORTATION SERVICES,

*Petitioner, Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent, Cross-Petitioner.*

—————————

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Board Relations Board.
Nos. 25-CA-27551-1 & 25-CA-27705-1

—————————

ARGUED DECEMBER 9, 2004—DECIDED MARCH 21, 2005

—————————

Before FLAUM, *Chief Judge,* and BAUER and WILLIAMS,
*Circuit Judges.*

FLAUM, *Chief Judge.* Petitioner Ryder Truck Rental
("Ryder") seeks review of a decision of the National Labor
Relations Board ("NLRB" or "Board") holding that Ryder
violated §§ 8(a)(1), 8(a)(3), and 8(a)(4) of the National Labor
Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3), and (a)(4)
("NLRA" or "Act"). The NLRB has filed a cross-application
for enforcement of its order. Because the Board's decision is

supported by substantial evidence, we deny Ryder's petition for review and enforce the Board's order.

## I. Background

On April 17, 2001, the International Association of Machinists and Aerospace Workers ("Union") filed a charge with the NLRB alleging that Ryder violated several provisions of the Act. Among other things, the Union alleged that Ryder violated §§ 8(a)(1) and (a)(3) of the Act by discharging employees Timothy Bullman and Allen Feldscher in retaliation for their support for the Union. This charge was later amended and consolidated with a separately-filed charge. An administrative law judge ("ALJ") heard the consolidated case between December 10 and December 13, 2001. On August 1, 2002, the ALJ issued a comprehensive, 55-page decision and order, concluding, in relevant part, that Ryder had violated § 8(a)(1) of the Act by:

(a) Requesting employees to report to management employees who in advocating the Machinists "harass" employees.

(b) Soliciting employee grievances and directly or impliedly promising those grievances would be remedied if they rejected the Machinists as their collective-bargaining representative.

(c) Threatening employees with the loss of vacation benefits if they voted for the Machinists, selected the Machinists as their collective-bargaining representative, or if Respondent entered into a collective-bargaining agreement with the Machinists.

(d) Informing employees that bargaining will start at ground zero like a blank sheet of paper, if its employees select the Machinists as their collective-bargaining representative.

(e) Creating the impression of surveillance of employees' union activities.

(f) Disparaging employees because of their support for the Machinists.

(g) Threatening employees with discharge because they provided testimony to the Board.

The ALJ also concluded that Ryder violated §§ 8(a)(1) and (a)(3) of the Act by discharging Bullman and Feldscher, and violated §§ 8(a)(1), (a)(3), and (a)(4) of the Act by suspending and issuing a final written warning to employee Otis Carpenter because he engaged in union activities and provided an affidavit to the Board.

The ALJ issued an extensive remedial order requiring Ryder, among other things, to: (i) cease and desist from each of its labor violations; (ii) reinstate Bullman and Feldscher and make them whole for any loss of earnings and other benefits they suffered as a result of the unlawful discrimination against them; and (iii) provide notice to all employees of Ryder's violations of federal labor law and inform employees of their federal rights.

On April 30, 2004, a panel of the Board affirmed the ALJ's findings of fact and conclusions of law and adopted the recommended order.[1]

In its petition to this Court, Ryder only seeks review of the Board's conclusion that it violated §§ 8(a)(1) and (a)(3)

---

[1]  One member of the three-member panel dissented in part, disagreeing with the ALJ's conclusion that Ryder violated § 8(a)(1) by instructing employees who felt they were being harassed to file a written report of that conduct. The dissent also specified that, although it would adopt the ALJ's finding that Ryder managers violated § 8(a)(1) by soliciting employee grievances and promising to remedy them, it relied only on certain evidence to support this conclusion. Other than these limited exceptions, the panel unanimously adopted the ALJ's opinion.

of the Act by discharging Bullman and Feldscher. Ryder does not contest the Board's other conclusions or the corresponding portions of its remedial order, and we enforce the Board's order with respect to those uncontested issues. *See Rock-Tenn Co. v. NLRB*, 69 F.3d 803, 807-08 (7th Cir. 1995). However, the unchallenged violations do not disappear altogether. *Id.* at 808. "They remain, lending their aroma to the context in which the contested issues are considered." *Id.* (quoting *NLRB v. Shelby Mem'l Hosp. Ass'n*, 1 F.3d 550, 567 (7th Cir. 1993)).

We begin with a recitation of the relevant facts. Ryder is headquartered in Miami, Florida and is engaged nationwide in the business of renting, leasing, and servicing commercial vehicles. Ryder maintains three facilities in its Indianapolis customer business unit: Indianapolis East, Indianapolis West, and Indianapolis North. Each of the Indianapolis locations is staffed by, among others, technicians who perform major repair and maintenance on the trucks, and service island attendants who fuel, inspect, and perform minor maintenance. While the employees at Indianapolis North are represented by Teamsters Local 135, the employees at the Indianapolis East and West facilities have never been represented by a union.

## A.  Bullman's Organizing Activities

Bullman began working for Ryder as a T-1 technician in 1995, and by November 2000 was promoted to the T-3 level.[2] During this period, Bullman became concerned about the prospect of the Indianapolis West facility converting to a 24-hour, 7-day work schedule. He also learned that employees at a unionized Ryder facility in Cincinnati were

---

[2]  Technicians are classified on an ascending scale from grade T-1 through T-4.

earning more per hour than nonunion employees at the Indianapolis locations. Bullman contacted the Union and spoke with its business representative, John Silhavy, about organizing the Indianapolis East and West facilities. Around the same time, Bullman also e-mailed Ryder's human resources department in Miami to complain about the conversion to a 24-7 schedule and wrote to Rhae Buckley, the senior manager of human resources for the region, to complain about the lower pay of the Indianapolis shops compared to the Cincinnati shops.

On November 16, 2000, Bullman and Chad Luster, another Ryder employee, met with union representative Silhavy. Bullman and Luster signed a petition stating:

> We believe that only through collective bargaining can we have a voice in our work place, achieve fair treatment for all, establish seniority and better benefits, wages and working conditions. Therefore, this will authorize the International Association of Machinists and Aerospace Workers, AFL-CIO to represent me in collective bargaining with my employer. This will also authorize the union to use my name for the purpose of organizing Ryder Transportation Services.

In the following days, Bullman approached fellow Ryder employees about signing the petition. Some employees informed Bullman's supervisor, Richard Woehlke, about Bullman's organizing efforts on behalf of the Union. Woehlke testified that he told these employees "if you feel you are being harassed then you need to put it in writing and then come see me."

## B. Ryder's Response

On December 11, 2000, the Union submitted a petition for an election among the 32 service attendants and technicians at the Indianapolis East and West facilities. Ryder management immediately began devising a strategy

to respond to the petition. For the following three days, December 13, 14, and 15, 2000, Buckley met with Bill Herlihy, regional director of employee-labor relations, and Roger Cicchini, regional vice-president of operations, to "identify key participants, [and] set forth [an] action plan and key issues to be addressed." During these meetings, Buckley explained to Cicchini the "dos and don'ts" of conducting a union campaign, which he shorthanded as "TIPS"— meaning that management cannot threaten, interrogate, make promises to, or engage in surveillance of employees. The managers devised an extensive campaign schedule consisting of daily meetings between managers and employees in the shop. At these meetings, managers sought to explain the company's view that a union was not necessary and that they should give new regional general manager Michael Campanale a chance.[3]

Adhering to this campaign schedule, Ryder managers met with employees almost daily until January 19, 2001, the planned election date. On December 19, 20, and 21, 2000, Buckley and Herlihy met with all six shifts of employees subject to the petition. Herlihy and Buckley also met with local management, including customer service manager David Toneges and Woehlke, and explained to them the "TIPS limitations."

The regional managers met with certain employees on an individual basis and kept track of the employees' positions toward the Union. On December 18, vice-president Cicchini met with Bullman. Cicchini acknowledged that there was a lot of commotion related to the Union and asked about Bullman's concerns. Bullman complained about the payment system, and Cicchini responded that he understood

---

[3] Campanale assumed the position of general manager of the Indianapolis customer business unit in November 2000 after transferring from another Ryder facility.

the employees' concerns and that things would work out for the better. Shortly thereafter, Bullman was called into another meeting with Herlihy and Buckley. During this meeting, Bullman revealed that he intended to vote for the Union because he believed employees needed a union to get a "fair shake."

On December 28 or 29, 2000, Toneges received an e-mail with an attachment entitled "Manager Communications Kit," announcing the adoption of the company's new nationwide vacation plan. The plan, which was to become effective January 1, 2001, reduced the amount of time necessary to acquire three weeks of vacation and allowed employees a one-time opportunity to transfer unused vacation days from the old vacation plan to the new one. The kit contained the following eligibility requirement: "All full-time and part-time employees in the U.S. are eligible, except for those employees operating under a collective bargaining agreement."

On January 3 and 4, 2001, regional managers Herlihy and Buckley returned to Indianapolis to meet again with each of the employees. The managers told employees about the new vacation plan and stated that it applied to all employees except those covered by a collective bargaining agreement. At one of the meetings, Herlihy said that employees would receive the new vacation benefits only if they voted against the Union and did not have a collective bargaining agreement. He also stated: "once you elect a Union you have nothing, you have no benefits, this is what you got, nothing" and held up a blank sheet of paper.

During these meetings, management showed a video that attributed trucking industry deregulation and the failure of trucking businesses to unions. At one of the meetings, Bullman raised his hand to challenge the claims in the video. Campanale also addressed the employees and asked to be given a chance as the new general manager. He promised that if employees voted against the Union, he would

make everything right after the vote. At the end of the meeting, Herlihy again held up a blank sheet of paper and said, "remember, guys, this is what you get, blank." He also said that if the employees voted for the Union, they would not receive the extra vacation days under the new vacation plan.

During the first week in January, Toneges posted a copy of the company's new vacation plan, including the eligibility requirement. Prior to the election scheduled for January 19, 2001, Woehlke held meetings at the Indianapolis West facility where he informed employees that collective bargaining units were not covered by the new vacation policy. When Bullman later applied for his vacation days, Woehlke told him that although Bullman had some extra vacation time, he would only receive it if he voted against the Union.

On January 5, 2001, Ryder's Miami headquarters sent an urgent e-mail to all officers and directors informing them that the company's recently announced vacation policy contained an error and was under review, and that the "one-time transition component of the vacation program is being modified." The memo directed managers to halt all activity related to the vacation program, including the scheduling of vacation time for 2001, pending further instruction. Although this e-mail was distributed to Buckley and Herlihy and forwarded to Toneges within the week, no regional or local manager notified employees that the vacation policy was under review. On January 17, Toneges received an e-mail with an attached memo stating that the information employees had received about vacation was incorrect and "too good to be true." Toneges was instructed to post the memo immediately, but he did not do so, nor did he inform employees that the new vacation policy was being modified. The memo was posted only after January 19, the date on which the election was scheduled.

On January 17, 2001, two days before the scheduled election, Ryder held a luncheon meeting for its employees at a local Marriott hotel. Employees were paid for their attendance and received a free lunch. Management did not mention the pending modification of the vacation policy at this meeting even though it was aware of the planned changes. Rather, management announced the date of the election and stated that everyone needed to vote, regardless of how he intended to vote. Herlihy remarked that an employee could still vote against the Union even if he had signed a union card. He also said that the employees should trust the company and give it a chance. Bullman challenged Herlihy, asking how he could ask the employees to trust management when he had provided inconsistent information about seniority to different employees. Herlihy responded using profanities and accused Bullman of lying by calling in sick and then going out to knock on doors to drum up support for the Union.

Before January 19, Bullman and Silhavy agreed that the Union should withdraw its election petition, based at least in part on the sentiment of some employees that they should give the company an opportunity to deliver on its new vacation policy. The Union withdrew the petition on January 18, 2001, the day before the scheduled election.

On March 5, 2001, Silhavy sent a mailing to employees raising questions about the latest modification to the company's vacation plan and soliciting their signatures on another petition for an election.

## C. Bullman's Termination

On March 27, 2001 Bullman was assigned to a maintenance job on a Thermal King refrigerated truck for customer Dixon Fish. Bullman performed various tasks listed in the maintenance schedule, including replacing the oil filter. He then completed various tasks listed on the pre-

ventive maintenance worksheet, checking off the appropriate lines to indicate that he had performed each of the tasks. Bullman checked off the lines indicating that he had restarted the refrigeration unit and inspected it for pressure and leaks even though he had not done so.

The next night, Bullman was told by the technician in charge that the Dixon Fish refrigeration unit had leaked because he had installed the wrong oil filter. Bullman informed his supervisor that he had made this mistake. A few weeks later, on April 11, upon reporting to work, Toneges summoned Bullman to the conference room and asked if he knew anything about an oil leak in a Dixon Fish truck. Bullman replied that he had mistakenly put the wrong filter on the unit. When pressed by Toneges, Bullman admitted that he had falsified the preventive maintenance sheet, indicating that he had checked the vehicle after changing the oil filter, when in fact he had not. Toneges told Bullman that he was being discharged for falsifying company documents and presented him with a termination letter. Bullman refused to sign the document. He accused Toneges of firing him for his union activities.

Bullman testified that after they discharged him, Toneges and Woehlke directed him to follow them through the lunchroom and the shop where employees were working. As they walked, Woehlke mimicked Bullman's gait and the way he swung his arms. Bullman asked Woehlke to leave him alone and let him go home. Woehlke replied that he was a Ryder employee and Bullman was not and that as long as they were on Ryder grounds, Woehlke could do whatever he wanted to Bullman. A minor physical confrontation took place before Bullman departed.

Toneges testified that Bullman had been discharged for falsifying the preventive maintenance report in violation of Ryder's corporate guidelines. Toneges specifically pointed to the policy listed under "Embezzlement, Theft, Fraud, and Non-Monetary Irregularities," which prohibited conduct in-

cluding "falsification of any reports submitted to financial or operational management." Buckley and Cicchini were not involved in the decision to discharge Bullman, but both testified that they would have recommended the discharge.

### D.  Feldscher's Union Position

On December 18, 2000, during one of his pre-election visits to the Indianapolis West facility, Cicchini met one-on-one with employee Allen Feldscher, a service attendant who had been employed by Ryder since 1979. Cicchini identified himself, explained that the Union had filed a petition, and said that he wanted to speak to the employees because he did not want them to "go union." Cicchini asked Feldscher about his problems with the company. Feldscher responded that the evaluation system was unfair and was used to prevent employees from receiving a raise. He also complained about being disciplined in May 2000 because he took leave to deal with his wife's illness. Cicchini took notes during the meeting. He indicated that he agreed with Feldscher and said that management could work out the problems without a union.

Managers Herlihy and Buckley also met with Feldscher individually to discuss the new company vacation policy. Herlihy brought a folder containing notes with Feldscher's name on it. In addition to discussing the vacation policy, the managers and Feldscher reviewed the disciplinary action taken against Feldscher for being late when he had taken his wife to the emergency room. Feldscher told Herlihy and Buckley that he thought the employees needed a third party to represent their interests. Buckley responded that management was not that "hard-nosed" and that some changes were going to be made—for example, employees were going to be evaluated every six months instead of every year.

During the last week of January 2001, after the Union withdrew its election petition, Feldscher heard that Ryder was going to make changes to the new vacation program that had been promised to employees. Feldscher told fellow employees that he was dissatisfied with the modifications to the vacation program and planned to raise the issue at the safety meeting scheduled for February 20, 2001.

### E.  Feldscher's Termination

Feldscher testified that on February 11, 2001 he was changing tires on a truck when a screw fell out of his pre-scription safety glasses. At that moment, Woehlke entered the shop and saw him working without his safety glasses in violation of company policy. Upon seeing Woehlke, Feldscher immediately put on a spare pair of safety glasses from another employee's toolbox.

Feldscher had violated the safety glasses policy several times before. On February 3, 2000, he was written up for two separate incidents of failing to wear safety glasses. The report stated: "Employee needs to be reminded every day to put on safety glasses. . . . If this keeps up employee will be terminated." On May 24, 2000, Feldscher received a "Notice of Safety Violation" for two more conduct violations, one of which was for failure to wear safety glasses on that date. This notice resulted in a three-day suspension and stated: "This is the last warning. Next time will be termination of employment." Despite this admonition, Feldscher again was found without safety glasses several times between May 24, 2000 and February 11, 2001. In each instance, he was given only a verbal warning.

At Feldscher's request, on February 11, the day of the last safety glasses violation, Woehlke agreed to meet with Feldscher to provide him with his evaluation and annual review. During that meeting, Woehlke asked Feldscher why he had not been wearing his safety glasses earlier.

Feldscher explained that the screw had fallen out, that the driver was waiting for the truck, and that he decided to complete the job because he was almost finished. Feldscher showed Woehlke his broken glasses. Woehlke told Feldscher that the company was enforcing its rule on the wearing of safety glasses, and that he needed to have safety glasses at all times.

Woehlke then returned to Feldscher's evaluation and review. He told Feldscher that he wanted to move him to the third shift so he could gain more experience and possibly be promoted from a service attendant to a T-1 technician. Woehlke told Feldscher that he needed to improve his compliance with the safety glasses requirement, and that he needed to work on his punctuality. He also told Feldscher that he was receiving a raise of one dollar an hour and that, if he could improve on the deficiencies noted, he would probably receive another raise within six months. Feldscher's safety rating was "fully competent," a two-category improvement from his 2000 evaluation. His work habit rating also improved from 2.3 out of 5 to 2.6, and his overall rating improved from 2.46 to 2.72.

When Feldscher reported to work the next day, however, Woehlke and Toneges summoned him to the office and told Feldscher that his employment was being terminated. Feldscher signed the notice of termination under protest.

Toneges testified that he decided to discharge Feldscher because, in the course of reviewing Feldscher's personnel file and speaking to Woehlke, he learned for the first time that Feldscher had been previously suspended for violating the safety glasses policy and that he had since been warned about other violations. On February 12, the same day he terminated Feldscher, Toneges issued written warnings to three other employees at Indianapolis East for violating the safety glasses policy a few days earlier.

## F.  Carpenter

Otis Carpenter began working for Ryder in 1978 and spent more than twenty years as a union steward on behalf of Teamsters Local 135 at the Indianapolis North facility. Carpenter provided an affidavit to the Board in support of the Union's charge in which he stated that he had overheard Toneges threatening to get rid of union activist Bullman.

On June 5, 2001, Carpenter represented an employee in a disciplinary meeting in which the employee received a warning for taking more than five sick days. At the meeting, Woehlke questioned whether the employee had been legitimately sick, and Carpenter accused Woehlke of ignoring a recent event in which fumes were dispersed throughout the shop during the cleaning of a tanker truck. Carpenter told Woehlke that he was in trouble with the NLRB and said: "When we go into arbitration, I am going to take these papers and I am going to roll them up and I am going to stick them in your ass and break them off." Woehlke testified that he felt threatened by this remark.

The following day, June 6, Carpenter attended a grievance meeting to protest the company's accounting of his sick days. Following the meeting, Toneges said that the company intended to reduce vacation time that employees could carry over from the prior year. Carpenter replied, "We have a contract," and Toneges told him he "wasn't going to last [too] long around there making testimony to [the] NLRB."

On June 8, Campanale telephoned Carpenter and told him he was being suspended indefinitely. Later, Campanale told Carpenter's union representative that he was suspended for the remarks he had made to Woehlke during the June 5 grievance meeting. At the end of the second week of the suspension, Campanale called Carpenter and told him he could return to work with full back pay. When Carpenter returned to work the next day, however, Toneges gave him a "zero tolerance" warning letter charging him with creating

a hostile work environment by making a member of management feel uncomfortable. The letter also threatened Carpenter with further disciplinary action, up to and including termination, if he repeated that conduct. Carpenter received full back pay for his suspension.

## II. Discussion

The National Labor Relations Act protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. The NLRB found that Ryder violated §§ 8(a)(1), 8(a)(3), and 8(a)(4) of the Act.

> Section 8 provides in pertinent part:
>
> (a) Unfair labor practices by employer
>
> It shall be an unfair labor practice for an employer —
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>
> ***
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .
>
> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

29 U.S.C. § 158(a).

This Court has jurisdiction to review applications for enforcement and petitions for review of Board decisions pur-

suant to §§ 10(e) and (f) of the NLRA, 29 U.S.C. §§ 160(e), (f). We will enforce the NLRB's order if its factual findings are supported by substantial evidence and its conclusions have a reasonable basis in the law. *Bloomington-Normal Seating Co. v. NLRB*, 357 F.3d 692, 694 (7th Cir. 2004). The substantial evidence test "requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy the reasonable fact finder." *ATC Vancom of Cal. v. NLRB*, 370 F.3d 692, 695 (7th Cir. 2004) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998)) (emphasis in original). We owe particular deference to the Board's credibility determinations, which we will disturb only in extraordinary circumstances. *SCA Tissue N. Am. v. NLRB*, 371 F.3d 983, 988 (7th Cir. 2004).

We apply a similarly deferential standard in determining whether the Board's legal conclusions have a reasonable basis in law. *Int'l Union of Operating Eng'rs v. NLRB*, 325 F.3d 818, 828 (7th Cir. 2003). We must uphold the Board's legal conclusions unless they are irrational or inconsistent with the NLRA. *ATC Vancom*, 370 F.3d at 695. Where the Board adopts the ALJ's findings of facts and conclusions of law, it is the ALJ's determinations that we review.[4] *SCA Tissue*, 371 F.3d at 988.

To establish a prima facie case of discrimination, the General Counsel—the entity responsible for prosecuting complaints before the Board—bears the burden of showing that: (1) the employee engaged in a protected activity; (2) the decisionmaker knew it; and (3) the employer acted because of anti-union animus. *Id.* If the General Counsel succeeds, the company must either rebut that evidence or

---

[4] Unless otherwise stated, the factual findings and legal conclusions we refer to herein are those made by the ALJ and adopted by the Board.

mount an affirmative defense that the company would have taken the same action despite the employee's protected activities. *Id.* (citing *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *approved by NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983)).

Ryder asks this Court to deny enforcement of the portion of the Board's order requiring Ryder to reinstate Bullman and Feldscher with back pay. Ryder concedes that the General Counsel established a prima facie case of discrimination with respect to Bullman but contends that it sufficiently rebutted that evidence by showing that it discharged Bullman because he knowingly falsified an operational report, not because of his union activity. With respect to Feldscher, Ryder asserts that the General Counsel failed to establish a prima facie case of discrimination because the manager who terminated Feldscher was unaware of his purported union activity. In any event, Ryder contends that it presented sufficient evidence that it terminated Feldscher because of his repeated violation of the company's safety policy. We consider each of Ryder's contentions in turn.

**A. Bullman**

The ALJ determined that the General Counsel made out a prima facie case that Bullman's discharge was caused by his participation in union activity. Bullman was a leading union activist, and Ryder does not contest that management was well aware of his activities. The ALJ further concluded that Ryder failed to demonstrate that it would have terminated Bullman absent his union activity. In making this determination, the ALJ discredited Ryder's asserted reliance on its corporate guidelines. He reasoned that the particular provision cited by Ryder was directed at transgressions involving "stealing, or manipulating [one's] position with the company for personal gain." The provision mentioned violations such as "conversion to cash of any checks made

payable to the company," "accepting, soliciting, or giving gifts, gratuities, or any other personal benefit or favor from or to suppliers," and "misstatement of travel or expense reports," and the ALJ found that this provision was not meant to apply to an employee who made a misstatement on a preventive maintenance report. Significantly, he found that two key Ryder witnesses, Buckley and Cicchini, were not credible, as they "exhibited a willingness to say whatever they felt was necessary to advance Respondent's cause at the proceeding."[5] The ALJ also credited Bullman's testimony that managers paraded him in front of the other employees and mocked him as he was escorted out of the facility as further evidence of the company's anti-union animus.

Ryder contends that these findings do not constitute substantial evidence that Ryder terminated Bullman because of his union activity. We are unpersuaded. The ALJ found management's testimony to be unworthy of credence, and we find no extraordinary reason to disturb this finding. The ALJ's factual findings were rational and sufficient to persuade a reasonable fact finder that Ryder would not have discharged Bullman but for his union activism. In fact, short of a "smoking gun" admission by a manager that Ryder fired Bullman because of his organizing activities, we are unaware what more the General Counsel could have done to reveal Ryder's true motivation. The General Counsel has never disputed that Bullman violated company policy by falsifying the preventive maintenance report, but argues that terminating his employment for this single vio-

---

[5] Earlier in his decision, the ALJ noted that he did not find Toneges to be a credible witness, observing that his testimony at the hearing concerning Herlihy's comments at the pre-election meeting contradicted his earlier affidavit. The ALJ was unpersuaded by Toneges's efforts at the hearing to distance himself from his earlier affidavit.

lation was disproportionate to the offense and was not the true reason for the discharge. The ALJ pointed to substantial evidence in the record to support the General Counsel's version of events. For example, he observed that Ryder had never discharged another employee for falsifying a preventive maintenance report. The ALJ also credited Bullman's testimony that Woehlke had actually instructed employees to falsify documents by claiming that they had performed certain maintenance tasks which they had not done in order to charge customers more. We find that Bullman's falsification of the preventive maintenance report in this instance "furnished the excuse rather than the reason" for the discharge. *SCA Tissue*, 371 F.3d at 991-92 (quoting *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965)). The Board's order reinstating Bullman with full benefits is well-founded and shall be enforced.

## B. Feldscher

Ryder contends that Toneges, the individual who made the decision to terminate Feldscher's employment, was unaware of any union activity by Feldscher at the time he made that decision. The ALJ's finding to the contrary, however, was supported by substantial testimony and reasonable credibility determinations. First of all, Toneges admitted that he kept a list of employees indicating how he expected each to vote and that he discussed his list with the other managers on more than one occasion. Moreover, the ALJ credited Feldscher's testimony about his meetings with Ryder managers Cicchini, Buckley, and Herlihy in which he told them that he believed the employees needed a third party to represent them. The ALJ also explicitly discredited the testimony of managers Buckley, Woehlke, and Toneges that they thought Feldscher was against the Union. Given the relatively small size of the bargaining unit at issue (32 employees), management's significant efforts to keep track

of employees' positions regarding the Union, and Feldscher's statements to his coworkers shortly before his discharge that he planned to challenge the company's broken promises on its vacation policy, the ALJ and the Board reasonably concluded that Toneges was aware of Feldscher's views regarding the Union. Substantial evidence supports the finding that Ryder "terminated Feldscher as part of an effort to prevent the Union from resurfacing at its Indianapolis facilities."

The ALJ also found Feldscher's termination on February 12, 2001 for violating safety policy difficult to reconcile with the positive evaluation he had received the previous day. During this evaluation, Woehlke—after discussing the safety glasses incident earlier that day—gave Feldscher a markedly improved safety rating and overall improvement, including a raise and the possibility of another promotion in six months. The ALJ concluded, therefore, that the General Counsel had established a prima facie case of unlawful discharge and shifted the burden to Ryder to demonstrate that it would have taken the same action in the absence of Feldscher's union activities.

The ALJ reasonably concluded that Ryder failed to meet this burden. Based on the vacillating testimony of several Ryder managers, he found that Ryder had no fixed policy on how to treat employees with respect to safety glasses violations. In general, the ALJ concluded that the testimony of Ryder's witnesses was marked by internal inconsistencies as well as conflicting stories between witnesses. For example, although Toneges testified that Feldscher was found without his glasses several times after his suspension, he could not explain why Feldscher continued to receive only verbal warnings. Toneges also could not account for the lack of documentation of these warnings in Feldscher's personnel file when he testified that it was customary to document verbal warnings. The ALJ disbelieved Toneges's testimony that he was unaware that Feldscher's glasses had

been broken on February 11. He also found much of Buckley's testimony incredible, particularly his testimony that Feldscher called him the day before the discharge and told him that he had been suspended and admitted he probably should have been terminated. Nor did the ALJ believe Buckley's testimony that he had recommended termination for another employee for not wearing safety glasses, as there were no records to corroborate this claim.

Ryder has not provided us with an extraordinary basis for overturning the ALJ's credibility determinations but rather asks us to reweigh the evidence and reach our own conclusions. We may not do so under the applicable standard of review. *See Bloomington-Normal*, 357 F.3d at 695 ("It is not our place to engage in our own fact finding or supplant the Board's reasonable conclusions even though we would justifiably have made a different choice had the matter been before us de novo."). We conclude that substantial evidence supports the NLRB's finding that Ryder discharged Feldscher because of his support for the Union, and we do not disturb its decision.

### III.  Conclusion

We DENY the petition for review and ENFORCE the Board's order.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*