In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1365 & 05-1791

FEDEX FREIGHT EAST, INC.,

*Petitioner,*
*Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*
*Cross-Petitioner.*

Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board,
Case No. 13-CA-40188.

ARGUED OCTOBER 26, 2005—DECIDED DECEMBER 12, 2005

Before FLAUM, *Chief Judge*, and EVANS and WILLIAMS, *Circuit Judges*.

FLAUM, *Chief Judge*. Tommy Grass ("Grass") filed a charge under section 10(b) of the National Labor Relations Act ("Act"), 29 U.S.C. § 10(b), alleging that his employer, FedEx Freight East, Inc. ("Cross-Respondent" or "FedEx"), engaged in unfair labor practices by suspending and discharging him based on his union activity. After investigating the charge, the General Counsel of the National Labor Relations Board ("Board") issued a

complaint alleging that FedEx violated section 8(a)(1) of the Act by threatening Grass and section 8(a)(3) of the Act by suspending and discharging Grass based on his union activity. 29 U.S.C. §§ 158(a)(1), (3). The ALJ found for the General Counsel. The Board adopted the ALJ's recommended order, but only part of the ALJ's reasoning. The Board ordered FedEx to cease and desist from discriminating against employees based on union activity, ordered FedEx to reinstate Grass, and awarded back pay. FedEx petitions this Court for review of the Board's order. The Board brings a cross-petition for enforcement of its order. For the following reasons, we deny FedEx's petition and grant the Board's cross-petition.

## I. Background

Grass was a driver at FedEx's Summit, Illinois terminal from June 3, 1996, until he transferred to the company's newly constructed Chicago Heights terminal in March 2001. He remained a driver at the Chicago Heights terminal until his discharge on May 15, 2002. Prior to Grass's discharge, Grass's supervisors found him to be a "good worker" with "good numbers." Witnesses for FedEx testified, however, that Grass was a slow worker and was sometimes suspected of "milking the clock." Nonetheless, Grass was never officially reprimanded by FedEx.

At the time of the incidents alleged in the General Counsel's complaint, Art Hollrah ("Hollrah") was a terminal manager and Grass's immediate supervisor at Chicago Heights. Hollrah reported to David Boyle ("Boyle"), a vice president of Cross-Respondent. Stuart Baxter ("Baxter") was Hollrah's human resources manager. Chris Merritt ("Merritt") was a city dispatcher and also a supervisor of Grass's, within section 2(11) of the Act, 29 U.S.C. § 152(11), during the relevant period. Tammy Despaltro ("Despaltro") was Grass's human resources representative at the Chicago

Heights terminal and was a supervisor within section 2(11) of the Act, 29 U.S.C. § 152(11). Robert Paulsen ("Paulsen") was Cross-Respondent's operations supervisor at the time, Bill Hawkins ("Hawkins") was a dispatcher at the Chicago Heights terminal, and Steve Cawgill ("Cawgill") was an operations manager.

In 1997, the International Brotherhood of Teamsters, Local 710 ("Union") attempted, unsuccessfully, to organize FedEx's drivers. At this time, only the Summit terminal was in operation. Grass was on the Union's organizing committee in 1997 and wore Union buttons on his hat and jacket while at work. In 2001, the Union again attempted to organize FedEx's drivers. In September 2001, Grass signed a Union authorization card and began speaking in favor of a renewed organizational effort to other drivers at the Summit and Chicago Heights terminals. There is no evidence in the record that any supervisor observed these activities, and Grass did not wear Union buttons in 2001. In December 2001, the Union filed a petition seeking to represent Summit and Chicago Heights drivers. The Union failed to generate sufficient support from drivers. Therefore, on December 28, 2001, the Union withdrew the petition for the Chicago Heights drivers and on January 30, 2002, withdrew the petition for the Summit drivers.

According to Grass's testimony, which the ALJ and the Board credited, Grass and human resources representative Despaltro had a conversation at Bally's Health Club in Chicago on January 12, 2002, about the Union's organizational activities. According to Grass, Despaltro told him that he was "making a big mistake with this union thing." Grass also testified that he had several conversations with Despaltro through late January, in which he argued that employees would benefit from affiliation with the Union. The ALJ credited this testimony. Grass further testified that Despaltro told him that FedEx would close the facility

if the Union was voted in. The ALJ did not credit this statement, in large part because Grass did not include it in his affidavits.

Additionally, Grass testified that in early January 2002, he was involved in an argument with Merritt in which Merritt accused Grass of taking more time than necessary to perform certain tasks. Grass reported that at the end of the argument, Merritt stated, "What are you mad [about]? Because the Union didn't get in?" Grass responded that his differences with Merritt had nothing to do with the Union. Merritt did not deny Grass's testimony, and the ALJ credited it.

The record shows that in late January 2002, FedEx took Grass off his usual route and assigned him to another one. In early February 2002, Grass complained to Boyle about the change. According to Grass, Boyle told him that he "didn't like [Grass's] attitude," that he would not let Grass "stay here and ruin this Company," and that Grass "knew what [Boyle was] talking about." Grass replied that he had worked hard for the company for 5½ years "and this is the thanks I get." Boyle did not deny this testimony and the ALJ found it to be credible. Soon after, FedEx restored Grass to his usual route.

Operations supervisor Paulsen testified that around the same time as the incident with Boyle, dispatcher Hawkins told Paulsen that Grass was "poisoning" the company and that Paulsen should keep a close watch on Grass. Paulsen also testified that FedEx was aware of Grass's involvement with the Union. Additionally, Paulsen testified that he told supervisor Hollrah and operations manager Cawgill that he had been a union driver and would not be a "headhunter" for Cross-Respondent and discharge employees without cause. The ALJ credited Paulsen's testimony.

On April 30, 2002, Grass was driving his old route. He was scheduled to make 11 deliveries and 4 pick-ups. Grass testified that he had to reverse the order of his usual route, which resulted in some delays, because FedEx employees had loaded his truck backwards. Grass testified that he was also delayed that day because a customer loaded its freight onto his truck in a way that blocked other deliveries. Grass testified that by the time he was scheduled to take his unpaid half-hour lunch break, he had not completed his morning deliveries and decided to complete a delivery while on his lunch break. He wrote on FedEx's driver detail form that he took lunch from 1:18 to 1:48 p.m. and that from 1:41 to 1:47 p.m., he made a delivery to the Auburn Corporation. Grass testified that at 3:17 p.m., he arrived at the Thomas Dodge Company for a pick-up. According to Grass, the freight he was to pick up was not yet ready, and he waited at Thomas Dodge until 4:17. Grass testified that he called dispatcher Merritt to report the problem and that Merritt told him the Thomas Dodge assignment would be erased from FedEx's computerized records. The paperwork generated by Grass's itinerary for April 30 shows no activity for the hour of 3:17 p.m. to 4:17 p.m.

Grass reported that because of the delays, he was unable to make his final two deliveries of the day, to Adheron Coatings and Fisher Services. Grass testified that he called Merritt to explain the problem and Merritt instructed Grass to report that the deliveries could not be made because both customers had closed by 3:00 p.m. FedEx's records show that Grass marked the 3:00 p.m. close time as the reason for his nondeliveries. According to FedEx's policy, when a driver fails to make a scheduled delivery, he or she is required to fill out a returned delivery receipt and check off one of twenty-eight possible reasons for the nondelivery. Misloaded freight is an acceptable reason for nondelivery. However, Merritt would have been held responsible for such a failure. Several drivers for

FedEx testified that dispatchers like Merritt routinely instructed drivers to list a 3 p.m. closure as the cause of a non-delivery, regardless of the true reason. Merritt denied having told Grass to report that the customers were closed by 3:00 p.m. The ALJ credited Grass's testimony over Merritt's. Hollrah testified that there are usually several returned packages each business day and that "there's freight that's brought back a lot."

Witnesses for FedEx testified that employees from Adheron Coatings and Fisher Services called to complain about the April 30 missed deliveries. However, employees of the two customers testified that they never called in the complaints alleged by FedEx. The ALJ credited the customers' employees' testimony and rejected FedEx's.

On May 2, allegedly in response to the customer complaints, Hollrah called Grass into his office and told him to write a statement recounting his actions on his route on April 30. Grass testified that he told Hollrah that he could not recall his exact itinerary for April 30 and that Hollrah did not provide him with the paperwork from that day to refresh his memory. Hollrah testified that he showed Grass the day's paperwork, and the ALJ credited Hollrah's testimony over Grass's. Grass wrote down his recollection of the day for Hollrah. According to Grass, after he completed the statement, he realized that he had made errors and therefore drafted a second short statement. In response to Hollrah's further questioning, Grass wrote three more short statements. Hollrah asked Grass to draft a sixth statement explaining why he had indicated on returned delivery receipts that he had failed to make the deliveries to Adheron Coatings and Fisher Services because the customers had closed by 3 p.m. Grass explained that his truck had been incorrectly loaded, which prevented him from making the deliveries and that he had reported the problem to Merritt, who instructed him to state on the

receipts that the deliveries could not be made because the customers had closed by 3 p.m.

Grass admits that his statements contain errors and contradictions regarding where he was on April 30 and why he did not make the two deliveries.[1] At the conclusion of the nearly two-hour meeting and after reviewing Grass's answers, receipts, and paperwork, Hollrah told Grass that he was suspended pending investigation, because records showed that he had not worked between 3:17 and 4:17 p.m. on April 30. Grass gave an explanation for the missing hour, though he did not say that he was at Thomas Dodge. Hollrah sent Grass home.

Hollrah testified that he consulted with Boyle and Baxter regarding Grass's case and forwarded relevant documents to them, along with his recommendation that Grass should be terminated. Boyle and Baxter agreed. Hollrah did not need Boyle and Baxter's approval to discharge Grass. On May 15, Hollrah told Grass that he was being discharged for submitting a false statement. FedEx's policy provides that "dishonesty" and "providing false or misleading information" are causes for immediate discharge.

Subsequently, Grass filed a charge with the Board alleging that his discharge violated the anti-discrimination provisions of the Act. *See* 29 U.S.C. §§ 158(a)(1), (3). The

---

[1] FedEx also argues in its reply brief that Grass wrote in his statements that he was making deliveries at Strnad Rivit four times on April 30, but that Grass admitted later that he never went to Strnad Rivit. However, FedEx did not make this argument in its opening brief. "As a general rule, we do not consider argument raised for the first time in a reply brief." *Dixon v. Page*, 291 F.3d 485, 489 (7th Cir. 2002). Application of that rule is appropriate here, especially because the ALJ and Board did not comment on this specific argument and we have no determination to review.

ALJ held that FedEx's suspension and discharge of Grass violated sections 8(a)(1) and 8(a)(3) because 1) the General Counsel proved, under *Wright Line v. Lamoureux*, 251 N.L.R.B. 1083 (1980), *enf'd* 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 898 (1982), that FedEx had knowledge of Grass's pro-union sympathies and suspended and discharged Grass based on anti-union animus; and 2) FedEx failed to prove that it would have taken the same actions against Grass even if he was not engaged in protected activity because FedEx's investigation of Grass was prompted solely by invidious anti-union motivation.

The Board adopted the ALJ's recommended order, but found it was unnecessary to reach the question whether FedEx's investigation had an invidious motivation. Instead, the Board found that the reasons FedEx gave for suspending and discharging Grass were false and pretextual and that FedEx failed to prove it would have taken the same actions in the absence of Grass's union activities. FedEx filed a timely petition for review with this Court, and the Board filed a cross-application for enforcement of its order.

## II. Discussion

Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" rights guaranteed under section 7 of the Act. 29 U.S.C. § 158(a)(1). Section 8(a)(3) prohibits an employer from discriminating against employees with regard to hiring, tenure of employment, or other terms and conditions of employment in order to discourage membership in a labor organization. 29 U.S.C. § 158(a)(3). An employer that discharges an employee because of his or her union activities violates sections 8(a)(1) and 8(a)(3) of the Act. *Vulcan Basement Waterproofing of Ill., Inc. v. NLRB*, 219 F.3d 677, 684 (7th Cir. 2000).

To prove that an employer violated the Act by discharging an employee, the General Counsel must show by a preponderance of the evidence that "(1) the employee engaged in a protected activity; (2) the decisionmaker knew it; and (3) the employer acted because of anti-union animus." *Ryder Truck Rental v. NLRB*, 401 F.3d 815, 825 (7th Cir. 2005) (citing *Wright Line*, 251 N.L.R.B. 1083). Once the General Counsel meets this burden, "the company must either rebut that evidence or mount an affirmative defense that the company would have taken the same action despite the employee's protected activities." *Id.*

FedEx challenges three aspects of the Board's decision. First, FedEx maintains that the Board's determination that FedEx was aware of Grass's union activities was not supported by substantial evidence. Second, FedEx argues that the Board erred by finding substantial evidence supported its determination that FedEx discharged Grass because of anti-union animus. Third, according to FedEx, the Board should have accepted FedEx's argument that it would have suspended and discharged Grass regardless of his union activities, because Grass was untruthful during FedEx's investigation of his April 30 itinerary.

## A. Standard of Review

In this case, where FedEx is challenging the Board's determination that the General Counsel's case is supported by substantial evidence, we owe significant deference to the Board's factual and legal conclusions and will not retry the case. As this Court has explained:

> We will enforce the NLRB's order if its factual findings are supported by substantial evidence and its conclusions have a reasonable basis in the law. *Bloomington-Normal Seating Co. v. NLRB*, 357 F.3d 692, 694 (7th Cir. 2004). The substantial evidence test "requires not the degree of evidence which satisfies the

*court* that the requisite fact exists, but merely the degree that *could* satisfy the reasonable fact finder." *ATC Vancom of Cal. v. NLRB*, 370 F.3d 692, 695 (7th Cir. 2004) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998))(emphasis in original). We owe particular deference to the Board's credibility determinations, which we will disturb only in extraordinary circumstances. *SCA Tissue N. Am. v. NLRB*, 371 F.3d 983, 988 (7th Cir. 2004).

We apply a similarly deferential standard in determining whether the Board's legal conclusions have a reasonable basis in law. *Int'l Union of Operating Eng'rs v. NLRB*, 325 F.3d 818, 828 (7th Cir. 2003). We must uphold the Board's legal conclusions unless they are irrational or inconsistent with the NLRA. *ATC Vancom*, 370 F.3d at 695. Where the Board adopts the ALJ's findings of facts and conclusions of law, it is the ALJ's determinations that we review. *SCA Tissue*, 371 F.3d at 988.

*Ryder Truck Rental*, 401 F.3d at 825 (footnote omitted).

FedEx maintains that we are required to review the Board's decision with "special scrutiny," based on this Court's decision in *Weather Shield Manufacturing, Inc. v. NLRB*, 890 F.2d 52 (7th Cir. 1989). That standard, however, applies only in instances in which the Board has rejected the ALJ's credibility determinations. *Id.* at 58 ("The first question we must address[ ] . . . is whether the Board rejected either the express or implied credibility findings of the ALJ. If it did, then the Board's conclusion is subject to special scrutiny rather than merely the substantial evidence test."). This is not such a case.

Before the ALJ, FedEx argued that it discharged Grass because Hollrah determined that Grass was dishonest about where he was on company time and why he did not make

deliveries to two customers. Contrary to FedEx's assertion, the ALJ did not credit Hollrah's testimony that Grass was fired for dishonesty.[2] Instead, the ALJ found that Grass's statements may have given the appearance of dishonesty. The ALJ's findings support two alternative theories under which the ALJ could reject FedEx's affirmative defense: first, that the reasons FedEx gave for discharging Grass were false and pretextual (since Grass was able to clear up

[2]  Specifically, the ALJ found:

> Before [FedEx]'s investigation, Grass did show in his paperwork an overlap between his lunchtime and the time of a delivery, but [FedEx] makes no suggestion that he did so to deceive [FedEx], or to deceive a customer, or to enrich himself. And [FedEx] does not contend that the overlap would have been noted by Hollrah, and would have caused Hollrah to investigate Grass' conduct of April 30, absent the alleged customer complaints. Grass also showed in his preinvestigation paperwork a failure to account for one hour, but Merritt did not deny Grass' testimony that Grass had told him that he had been delayed that amount by a pickup at Thomas Dodge. And [FedEx] does not contend that the lost hour would have been noted and investigated by Hollrah absent the alleged customer complaints. And Grass also showed in his preinvestigation paperwork that Fisher Services and Aderhon Coatings had closed before 3 p.m. when they actually did not, but Grass credibly testified that Merritt told him to do such and, anyway, the customers could not have been deceived about their own closing times. And again, [FedEx] would not have routinely investigated Grass' report of the customers' closing times absent the alleged customer complaints. But *even if* I agree with [FedEx] in all respects and found that Grass was inexcusably untruthful in his paperwork that he submitted before its investigation, the fact remains that [FedEx] did not begin its investigation because of that untruthfulness.

*Fedex Freight East, Inc. and Tommy Grass*, 344 N.L.R.B. No. 5, at 8 (Jan. 31, 2005) (emphasis added) [hereinafter "*Order*"].

the inconsistencies in his statements); and second, that even if Grass could not explain his apparent "untruthfulness," the fact that FedEx began its investigation based on antiunion animus was sufficient to show that Grass would not have been discharged but for FedEx's animus. The Board chose to rest its decision on the first theory, while the ALJ chose to rest it on the second.

We apply the substantial evidence standard of review here, where "the Board and the ALJ disagree as to . . . derivative inferences made from the testimony," *Weather Shield Mfg.*, 890 F.3d at 57, but do not disagree over the credibility of the testimony itself. The Board referred to specific findings by the ALJ that supported the Board's determination that the reasons given by FedEx for Grass's discharge were false and pretextual:

> [FedEx] claimed that Grass was discharged for lying in his paperwork about missed deliveries on April 30, 2002, for lying in conjunction with an inquiry into the missed deliveries, and additionally for lying "about his whereabouts on Company time." Credited evidence adduced at the hearing, some of it undisputed, belies these reasons. Grass' undisputed testimony is that the failure of deliveries on April 30 had several causes, among them the misloading by [FedEx]'s employees of Grass' truck on that day, and a delay encountered by Grass at an earlier delivery at Thomas Dodge. The judge credited Grass' testimony that he recorded the inaccurate reason for the nondeliveries—that the addressee-companies were "[c]losed after 3:00 p.m."—in his paperwork upon the instruction of dispatcher (and statutory supervisor) Chris Merritt. [FedEx] also claimed that Grass falsely reported that he was on his (unpaid) lunchbreak from 1:18 to 1:47 p.m., in apparent contradiction of his statement that he was making a stop at Auburn Corporation between 1:41 and 1:47 p.m. Grass explained that he carries his lunch with him and

"cut his lunch short because of the workload." [FedEx] did not produce evidence contravening Grass' testimony.

*Order* at 1 (emphasis added).

These findings by the Board are consistent with and supported by the ALJ's credibility determinations. Thus, we will enforce the Board's order "if its factual findings are supported by substantial evidence and its conclusions have a reasonable basis in the law," and we will overturn the Board's credibility determinations only if we find this to be an "extraordinary case." *Ryder Truck Rental*, 401 F.3d at 825.

## B. *Knowledge of Union Activity*

Under *Wright Line*, the General Counsel was first required to prove that FedEx was aware of Grass's union activities. FedEx argues that the evidence shows that FedEx was not aware of Grass's union activities and that the ALJ simply assumed that decisionmakers at FedEx had this knowledge. FedEx relies heavily on Grass's testimony that they were unaware of Grass's support of the Union. FedEx also points to testimony of its own witnesses, who stated that "they did not know of activity by Grass in support of a union." These witnesses include Hollrah, Merritt, and Boyle, among others.

Hollrah was the decisionmaker responsible for suspending and discharging Grass. FedEx argues that the ALJ erred by finding that Hollrah had knowledge of Grass's union activities because the ALJ "based this conclusion in part upon evidence of a single conversation between Hollrah and Robert Paulsen . . . , FedEx Freight's former Operations Supervisor, and Paulsen's conversation with two lower level supervisors, dispatcher Hawkins and Operations Manager Cawgill." Specifically, the ALJ found:

Paulsen, who was [FedEx]'s operations supervisor until he terminated in October, testified that 4 or 5 months before Grass was discharged *"information got out" that Grass was engaging in union activities*. At the time, he and dispatcher Hawkins and operations manager Cawgill had a discussion in which Hawkins said, "We need to keep an eye on Mr. Grass, . . . make sure he's doing everything out there right." Paulsen, obviously knowing that Hawkins was not just referring to Grass' performance (which, again, Hollrah testified was "good")[3] replied to Hawkins that, "I'm not going to be a headhunter for the company and fire people for no reason." Paulsen was immediately called on Hollrah's carpet and asked what Paulsen had meant by his statement. *Paulsen told Hollrah that he had once been a "union driver" and that he was not going to fire any employee for also being one.* Hollrah did assure Paulsen that [FedEx] did not want Paulsen to fire anyone for prounion sympathies, and that fact can be said to significantly dilute any evidence of animus that was implied by the statement of Hollrah's subordinate, Hawkins. Nevertheless, *the exchange is at least further proof that [FedEx]'s supervisors were aware of Grass' prounion sympathies and activities*.[4]

---

[3] The ALJ states that "[o]n cross-examination, Paulsen acknowledged that [FedEx] suspected Grass of running up extra hours (milking the clock) and that it would not be surprising that a manager would suggest keeping an eye on a driver who was suspected of doing such, but he denied that those suspicions about Grass were mentioned during those exchanges." *Order* at 5. The ALJ credited Paulsen's testimony.

[4] Specifically, Paulsen testified that Hollrah "asked me why . . . I . . . had the response of saying that I was not going to head hunt anybody's job. And I told him, 'Look, Art, I have been a union driver before I worked here, [and] I have been a supervisor. I'd
(continued...)

Order at 7 (emphasis added).

Substantial evidence supports the Board's conclusion that FedEx was on notice that Grass was engaged in union activity. The ALJ credited Paulsen's statement that "information got out" at FedEx about Grass's union activity. Additionally, Paulsen's testimony shows that Hollrah understood that Paulsen thought Hollrah wanted Grass fired because of his union activity. Even if Hollrah was not aware of such activity earlier, his conversation with Paulsen put him on notice that Grass was active in the Union. FedEx also argues that the ALJ erred by imputing knowledge of lower-level managers to Hollrah. However, the ALJ found specifically that Hollrah himself was made aware of Grass's union activities through his conversation with Paulsen, if not earlier. The fact that Grass testified that he did not openly support the Union at work (by wearing Union buttons, for example) does not disprove the conclusion that Hollrah found out about Grass's union activities in some other way. This is not an extraordinary case in which we should disrupt the Board's credibility determinations. *See SCA Tissue*, 371 F.3d at 988.

Additionally, Grass's testimony about his argument with Merritt, who was Grass's supervisor under the Act, indicates that FedEx knew that Grass was a Union supporter. In testimony the ALJ credited, Grass said that in early January 2002, he got into an argument with Merritt, in which Merritt asked Grass, "What are you mad [about]? Because the Union didn't get in?"

---

[4] (...continued)
just as soon stay out of the whole thing. I'm just keeping a low profile on the situation, and I do not like the way that this was going on, and I'm just not going to do it.' . . . He said, 'Well, that's not what we want you to do.' . . . I said, 'Okay, that's fine, because I'm not going to." *Order* at 5.

Moreover, a number of additional pieces of testimony support the ALJ's conclusion that FedEx was aware of Grass's union activity. Grass was a longtime union supporter and had openly and vigorously campaigned for the Union at FedEx's Summit facility in 1997. Grass was active in the Union's December 2001 organizing drive at Chicago Heights. In early January 2002, according to Grass's testimony, Despaltro told Grass he was "making a big mistake with the whole union thing." In early February 2002, Grass complained to vice president Boyle about being taken off his old route, and Boyle told Grass that he didn't like his attitude and then he would not let Grass "stay here and ruin the company." The company did give Grass back his old route. Around the same time, however, Hawkins told Paulsen that Grass was "poisoning the company."

All of this evidence, taken as a whole and reviewed under the substantial evidence standard, supports the ALJ's and the Board's conclusion that decisionmakers at FedEx were aware of Grass's union activities.

## C. Antiunion Animus

The second element of a *Wright Line* prima facie case is that the employer acted against the employee based on antiunion animus. FedEx argues that the Board's finding that FedEx possessed the requisite antiunion animus was not supported by substantial evidence, because 1) testimony regarding vice president Boyle's statements did not demonstrate that FedEx acted out of antiunion animus and 2) there was no evidence that FedEx had discriminated against other employees who openly supported unionization.

First, FedEx disputes the Board's finding that Boyle demonstrated antiunion animus. Grass testified that when he complained to Boyle about being taken off his regular route shortly after the unionization efforts failed

Dave Boyle said that he didn't like my attitude there. He said that I was unhappy and he didn't like to see me unhappy. Dave went on and said that he'd rather see me leave the Company and go somewhere else where I'll be happy.

And Dave said, "I'm not going to have you stay here and ruin this Company. And you know what I'm talking about."

*Order* at 3.

Boyle did not deny Grass's testimony, and the Board found it to be credible. The ALJ explained that this "threat by Boyle, a vice president of [FedEx], is more than enough proof of unlawful animus that would require [FedEx], under *Wright Line*, to go forward with evidence absent his protected activities." *Order* at 7.

The ALJ's explanation recognizes that Boyle did not tell Grass explicitly that Grass would "ruin the company" by helping to unionize employees. Nonetheless, the ALJ could reasonably infer this meaning from Grass and Boyle's conversation and the surrounding circumstances. *Cf. Van Vlerah Mech., Inc. v. NLRB*, 130 F.3d 1258, 1262-63 (7th Cir. 1997) (in determining if a section 7 violation occurred, "[t]he words used by the employer, as well as the context in which they were conveyed, must be examined"). In evaluating an allegation of discrimination based on antiunion animus, "the Board must determine the employer's motivation in taking a particular action[, and t]his determination often must be made on the basis of circumstantial evidence." *Id.* at 1263. We will not overturn the ALJ's determination even if we would reach a different outcome based on the same evidence. *See id.* ("We shall not 'displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo.'" (internal citation omitted) (alteration in original)).

As the Board points out, sophisticated employers have an incentive to avoid using explicit language when threatening employees for their union activity. Thus, "[i]n determining what an employee reasonably might have inferred from a communication, the Board must consider the economic dependence of the employee on the employer and the concomitant tendency of the employee 'to pick up intended implications . . . that might be more readily dismissed by a more disinterested ear.' " *Id.* (quoting *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617 (1969)) (alteration in original).

Looking at the circumstances surrounding Boyle's statement—including the Union's renewed efforts at FedEx's Illinois plants—it was reasonable for the Board to infer that Boyle's statement that he didn't want Grass to "ruin the company" referred to Grass's union activity and that his complaint about Grass's "attitude" referred to that activity as well. *Cf. SCA Tissue N. Am. LLC v. NLRB,* 371 F.3d 983, 989-91 (7th Cir. 2004) (finding employer terminated employee based on antiunion animus in part because of employer's comment about employee's "attitude"). The ALJ reasonably ruled out the possibility that Boyle was referring to Grass taking extra time to do his work when Boyle said he did not want Grass to "ruin the company," especially because Hollrah testified that Grass was a "good worker" with "good numbers." Moreover, as the ALJ determined, the inefficiency of a single employee would not "ruin" FedEx.

Second, FedEx points out that the company did not discriminate against other employees who openly supported the Union's 2001 organization attempt. FedEx argues that this shows it does not possess antiunion animus. As the Board correctly noted in its brief, however, "the fact that the Company did not avail itself of every opportunity to treat [U]nion supporters more harshly— either by keeping Grass

on an unwanted delivery route, or by discharging other [U]nion sympathizers—does not relieve it from responsibility for the unlawful actions that it did undertake." "[A] discriminatory motive, otherwise established, is not disproved by an employer's proof that it did not weed out all union adherents." *Union-Tribune Publ'g Co. v. NLRB*, 1 F.3d 486, 492 (7th Cir. 1993) (quoting *Nachman Corp. v. NLRB,* 337 F.2d 421, 424 (7th Cir. 1964)) (alteration in original).

## D.  Affirmative Defense

Finally, FedEx argues that the Board erred by rejecting its *Wright Line* defense. FedEx maintains that it would have suspended and discharged Grass regardless of his union activities. First, FedEx argues that the Board ignored findings by the ALJ that Grass lied to Hollrah during his investigation into Grass's activities on April 30. As explained above (*see supra* section I.A), although the ALJ went further than the Board thought was necessary—by finding that Hollrah's investigation would not have occurred but for FedEx's antiunion animus—the ALJ did not find that Grass was discharged for dishonesty.

The ALJ found that 1) Grass's paperwork showed an overlap between his lunchtime and the time of a delivery, but this was not evidence of Grass being dishonest; 2) Grass's statement to Hollrah did not account for an hour of time on April 30, but Grass was later able to account for this hour, which was missing because Merritt removed the Thomas Dodge delivery from FedEx's computerized records; and 3) two of Grass's returned delivery forms were marked with an incorrect reason for the return, but Merritt instructed Grass to mark this reason and Grass's actions did not deceive FedEx's customers. Based on this evidence, the ALJ reasoned that "I at least agree with [FedEx] that Grass *appeared* to be untruthful in some of the

answers that he gave during Hollrah's May 2 investigation."
*Order* at 8 (emphasis added). However, this statement does
not show that Grass *was* untruthful, was trying to deceive
FedEx, or was discharged because of his apparent untruth-
fulness. The Board, relying on the ALJ's findings of fact,
concluded that although Grass's statements were inconsis-
tent, his testimony cleared up the confusion surrounding his
actions on April 30.

Additionally, the Board found that Grass's action in
providing the wrong reasons for returning two deliveries did
not constitute a violation of company policy. Vice president
Boyle testified that Grass was discharged primarily for
falsely stating on FedEx's returned delivery receipts that he
was unable to deliver freight to Adheron Coatings and
Fisher Services because they were closed by 3:00 p.m. The
ALJ credited Grass's testimony that Merritt instructed
Grass to record this reason for the missed deliveries. The
testimony of other FedEx drivers established that Merritt's
instruction to Grass conformed with standard company
practice. Most important, one of those drivers, William
Kiley, testified that his "supervisor specifically told him
that under company policy, this did not constitute falsifica-
tion of records." Under these circumstances, the Board
reasonably found that FedEx's explanation for its discharge
of Grass was pretextual. *See Ryder Truck Rental*, 401 F.3d
at 826-27 (finding that an employer's explanation that it
discharged an employee because the employee falsified
maintenance reports was pretextual because the employer
had never discharged other employees based on this offense
and the employer had instructed employees to falsify
maintenance reports). We agree with the Board's conclusion
that FedEx's reasons for discharging Grass " 'furnished the
excuse rather than the reason' for the discharge." *Ryder
Truck Rental*, 401 F.3d at 827 (quoting *SCA Tissue*, 371
F.3d at 991-92).

FedEx's second argument in support of its affirmative defense is that it produced evidence that the company discharges all employees who are found to have been dishonest. As the Board points out, however, the discharged employees FedEx cites as examples were mainly managers and supervisors. FedEx also admitted at oral argument that the discharged employees it compared to Grass had been discharged for defrauding FedEx. FedEx produced no example of an employee who was discharged for reasons analogous to the why Grass was allegedly fired, i.e. providing a false reason for returning a delivery. This point—especially taken in conjunction with the testimony of other truck drivers that the conduct in question does not constitute falsifying records—undermines FedEx's affirmative defense. Under these circumstances, the Board's decision to reject FedEx's claim that it would have discharged Grass regardless of his union activity is supported by substantial evidence.

### III. Conclusion

For the foregoing reasons, FedEx's petition for review of the Board's order is DENIED and the NLRB's cross-petition for enforcement of its order is GRANTED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*