# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1382

_____

| | | |
|---|---|---|
| National Labor Relations Board, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| International Brotherhood of | * | |
| Electrical Workers Local 265, | * | Petition for Enforcement |
| | * | of an Order of the |
| Intervenor on Appeal, | * | National Labor Relations Board |
| | * | |
| v. | * | |
| | * | |
| Wolfe Electric Company, | * | |
| | | |
| Respondent. | | |

_____

Submitted:  September 12, 2002

Filed:  December 24, 2002

_____

Before McMILLIAN, BRIGHT and BOWMAN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

The National Labor Relations Board (the Board) petitions for enforcement of a final order finding that Wolfe Electric Company (the company) violated Sections (a)(1) and (3) of the National Labor Relations Act (the Act or NLRA), 29 U.S.C. §§ 158(a)(1), (3), by refusing to hire nine applicants because of their union

membership, and by other actions.  NLRB v. Wolfe Elec. Co., 336 N.L.R.B. No. 48 (2001). The International Brotherhood of Electrical Workers, Local 265 (the union), intervenes in support of the Board.  We enforce the order.

The evidence before the Board established the following.  Richard Wolfe (Wolfe) is president of the company, a non-union electrical contractor.  After learning that the union was attempting to organize non-union contractors by getting them to hire its members, Wolfe told his employees that, in light of the union's organizing activities, the company would quit advertising for workers in the newspaper and would hire employees through word-of-mouth referrals.  Wolfe also stated that  he would close the business before he would allow the union to organize it.  In early 1996, Wolfe told employees that the company would begin using an employment agency, Advantage Personnel, to hire workers, noting that the agency was experienced in screening out union members. On April 3, 1996, Advantage Personnel referred Doyle Horwart to Wolfe.  Horwart, a union organizer, had concealed his union membership from Advantage.  Horwart began working for the company on April 9, 1996.

On June 20, 1996, Wolfe told Horwart that two electricians had just quit and that he immediately needed six more workers.  Horwart told the union's business agent, Bill Roussan, about his conversation with Wolfe.  On July 8, 1996, Roussan and seven other union journeymen electricians and one union welder went to the company to apply for work.  They had a video camera and tape recorder and identified themselves as union members.  They asked Wolfe's wife, Karen, who was working as a receptionist, whether work was available.  She told them that they would have to speak to her husband. Roussan gave her a list of the nine applicants and thanked her, and she replied: "You're very welcome." Unbeknownst to the applicants, Mrs. Wolfe had terminal cancer.  After they left, she called her husband, telling him that she was upset because she might have said something that could be the basis of a lawsuit against the company.

After speaking to his wife, Wolfe posted signs outside the office stating that the company was not accepting applications and that audio and video equipment was prohibited. About two hours later, five of the applicants returned to the company. Wolfe told them that they had upset this wife and that she was suffering from cancer. They apologized, informing him that their encounter with Mrs. Wolfe had been cordial. Wolfe told them that he was not accepting applications and asked them to leave.

The next day, Wolfe held a employee meeting at which he expressed his anger at the union applicants for upsetting his wife. Wolfe further stated if any of the employees wanted to join the union, they could leave and that he would fight "to the end" the union or anyone who upset his wife. On July 22, 1996, Wolfe called another meeting at which he told the employees that he had refused to accept a certified letter from the union, reaffirming that he would fight the union to the end, if necessary. He asked the employees if they knew of any electricians that he could hire and that, if his attorneys approved, would take the "no applications" signs down for five minutes so that they could apply.

Between July 8 and September 9, 1996, the company hired six workers, but did not hire or consider any of the union applicants. At a November 1, 1996, employee meeting, Wolfe stated that if the employees voted in favor of the union, his customers would leave and he would have "to close the book on growth" because he could not pay union benefits. On December 23, 1996, Horwart gave the company a letter disclosing his status as a union organizer. That afternoon, Wolfe called an employee meeting. Before the meeting, Wolfe met with Horwart and gave him a copy of the company's new no-solicitation policy. At the meeting, Wolfe gave the employees the policy and the letter disclosing Horwart's status as a union organizer. Wolfe also mentioned that "union thugs" had been distributing handbills in front of the company and that he would file trespassing charges against anyone whose name appeared on a handbill found on the company's premises.

Adopting the decision of an administrative law judge (ALJ), the Board found that the company had violated Sections 8(a)(3) and (1) of the Act by refusing to hire the union applicants and by other actions, including threatening employees of adverse consequences if they unionized, changing employment practices to preclude the hiring of union members, and promulgating and enforcing the no-solicitation policy. As to the refusal-to-hire violation, the Board found that the company had concrete plans to hire workers on July 8, 1996; the applicants were qualified; and that the company had refused to hire the union applicants because of their union membership. The Board rejected the company's personal animosity defense under Wright Line, 251 N.L.R.B. 1083 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982). The company argued that even in the absence of protected activity, it would not have hired the union applicants because Wolfe was angry at them for having upset his wife. Noting that Mrs. Wolfe had terminal cancer and expressing sympathy, the Board held that the defense was unavailing because the union applicants were engaged in protected activity during their encounter with Mrs. Wolfe and had done nothing to deprive themselves of the benefit of the Act.

"Our standard of review affords great deference to the Board's affirmation of the ALJ's findings." Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). "We will enforce the Board's order if the Board correctly applied the law and its factual [and credibility] findings are supported by substantial evidence on the record as a whole." Id. In this case, substantial evidence supports the Board's order. Indeed, there is overwhelming evidence of the company's anti-union animus.

Contrary to the company's argument, the Board did not err in rejecting its Wright Line defense of personal animosity. Under Wright Line, once the General Counsel establishes that "protected conduct was a 'motivating factor' in the employer's decision [,] . . . the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." Pace Indus., Inc. v. NLRB, 118 F.3d 585, 590 (8th Cir. 1997) (internal

quotation omitted), cert. denied, 523 U.S. 1020 (1998). As the Board noted, Wolfe's animosity towards the union applicants arose from their conduct in a protected activity. It is true that "not every act in support of . . . unionization . . . is protected by the law." NMC Finishing v. NLRB, 101 F.3d 528, 531 (8th Cir. 1996) (NMC). However, conduct that occurs in the context of protected activity cannot be a lawful ground for adverse employment action unless it is "so egregious as to take it outside the protection of the Act, or of such a character as to render the employee unfit for further service." Consumers Power Co., 282 N.L.R.B. 130 (1986). The test to determine whether conduct is protected is objective, not subjective. NMC, 101 F.3d at 531.

In this case, there was no evidence of "misconduct that [was] sufficient to take the acts outside of the protections afforded [the applicants] under the NLRA." Id. Under an objective standard, the applicants' conduct during their July 8 encounter with Mrs. Wolfe was not threatening, "offensive, abusive, [or] obscene." Id. at 532. To the contrary, the evidence was that the encounter was cordial, and that the applicants had not violated any company rules. Moreover, the evidence was that Mrs. Wolfe was not upset because of the applicants' behavior, but because she feared her response to them may have provided the basis for a lawsuit against the company. We agree with the Board that Mrs. Wolfe's subjective fear of a lawsuit, or Wolfe's anger at the applicants having upset her, does not provide a justification for the company's refusal to hire the union applicants.[1]

---

[1]The company's reliance on Bay Elec., Inc., 323 N.L.R.B. 200 (1997) is misplaced. In that case, the Board held that the General Counsel had not established a prima facie refusal-to-hire case, finding that union organizers had not applied for jobs and that there were no job openings. As to one of the organizers, the Board noted that, in any event, the employer would not have hired him because of "personal animosity and dislike and not [because of] any activity . . . protected by the Act." Id. at 201.

The company's other arguments against enforcement of the Board's order are without merit.  Accordingly, we enforce the Board's order.  <u>See</u> 8th Cir. R. 47B.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.