# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-2187, 09-2289

LOPAREX LLC,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

Petition for Review of an Order of the
National Labor Relations Board.
Nos. 18-CA-18436, 18-CA-18448, and 18-CA-18671

ARGUED NOVEMBER 3, 2009—DECIDED DECEMBER 31, 2009

Before EASTERBROOK, *Chief Judge,* and WOOD and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Loparex LLC owns and operates a small manufacturing plant in Hammond, Wisconsin. When a handful of the 200 employees working at the plant began to drum up interest in unionizing the workforce, Loparex pushed back by placing a number of restrictions on organizing activity at the workplace. Loparex's actions were soon brought to the attention of

the National Labor Relations Board, which concluded that Loparex had engaged in a number of unfair labor practices in violation of the National Labor Relations Act, § 8(a)(1), 29 U.S.C. § 158(a)(1) ("the Act," or "the NLRA"). The Board ordered Loparex to cease and desist and to take several affirmative steps to remedy its past violations. Guided by the deferential standard of review applicable to the Board's decisions, we conclude that its order should be enforced.

**I**

Loparex owns multiple production facilities scattered across the country; at these plants, it manufactures polycoated and silicone-coated papers and films. In June 2006, Loparex acquired the Hammond plant from the Douglas-Hanson Company. Though the employees in that location had attempted to form a union when the plant was under the ownership of Douglas-Hanson, these efforts had died off by the time Loparex took over. With Loparex at the helm, employees' prounion sentiment lay dormant until early 2007, when the company announced several controversial employment policies. Spurred in part by their disagreement with the company's recent actions, a small group of employees renewed their efforts to unionize the plant. This campaign was not warmly received by Loparex officials.

In the back-and-forth that followed, Loparex imposed several limitations on union organizing at work. After union supporters posted material on company bulletin boards in March 2007, Loparex issued a policy statement

that required employees to obtain approval before placing any material on the boards. A few months later, several employees attempted to distribute prounion flyers in Loparex's parking lot, but they were stopped by company officials. Around the same time, employees passed out union buttons in the plant and left some of them near a time clock for other employees to pick up. When company officials learned of this activity, they quickly called a meeting and told the union advocates that they had violated company policy. Management also discouraged employees from talking about the union during working hours. Then, in June or July 2007, Loparex informed all of the shift leaders working at the Hammond plant that they qualified as supervisors under the NLRA and were thus prohibited from participating in union activities.

Following these events, Teamsters Local 662 filed three separate unfair labor practice charges. After a hearing in May 2008, Administrative Law Judge ("ALJ") Paul Bogas issued a decision in November 2008 finding that Loparex had violated the Act in several ways: by promulgating its bulletin board policy because of antiunion animus; by announcing unlawfully broad constraints on employee communications relating to unionization; and by treating shift leaders as though they were supervisors under the Act. Loparex filed exceptions to all but one of the ALJ's findings. (The ALJ also found that Production Manager Todd Dennison violated section 8(a)(1) of the Act in June 2007 when he informed a group of employees that they were prohibited from speaking about union organizing at work. Since Loparex did not

contest this conclusion before the Board, we summarily enforce the ALJ's order on this issue. See *NLRB v. Alwin Mfg. Co.*, 78 F.3d 1159, 1162 (7th Cir. 1996)). The Board affirmed the ALJ's findings of fact and conclusions of law for the most part, but it wrote separately on the issue of shift leaders' status as statutory supervisors. Loparex now petitions this court requesting that we set aside the Board's decision, and the Board cross-petitions to obtain an order enforcing its decision.

## II

Our review of the Board's decision is deferential. We accept its factual findings if they are supported by substantial evidence, and its legal conclusions "unless they are irrational or inconsistent with the [Act]." *Ryder Truck Rental v. NLRB*, 401 F.3d 815, 825 (7th Cir. 2005); see also *Brandeis Machinery & Supply Co. v. NLRB*, 412 F.3d 822, 829 (7th Cir. 2005); 29 U.S.C. § 160(e). Our focus is on the Board's decision; as a practical matter, we look to the ALJ's opinion on issues where the Board affirmed without additional comment.

### A.  Loparex's Bulletin Board Policy

The Board adopted the ALJ's conclusion that Loparex violated section 8(a)(1) when, against a backdrop of a corporate policy that permitted employees to use the bulletin boards for a variety of non-work purposes, it shut off access in response to union organizing activity. As support for his finding that the purpose of the new

policy was to inhibit the organization campaign, the ALJ pointed to a confrontational meeting between management and a union supporter that took place a few months before Loparex issued the policy. The evidence of an upsurge in prounion activity following that meeting, in the ALJ's view, supported an inference of Loparex's knowledge and distaste for the employees' organizing efforts. This aversion played a key role in the formulation of the bulletin board policy. Loparex objects that there is only a weak temporal connection between the earlier confrontation and the eventual issuance of the new bulletin board policy. Loparex adds that the evidence does not establish that the company was even aware that prounion materials had been posted on company bulletin boards.

Section 8(a)(1) offers employees broad protection from employers' attempts "to interfere with, restrain, or coerce employees in the exercise" of their statutory rights to organize under section 7. 29 U.S.C. § 158(a)(1); 29 U.S.C. § 157. Yet this statutory entitlement does not give employees an unfettered right to use a company's bulletin boards to stir up interest in unionization. See *Fleming Companies, Inc. v. NLRB*, 349 F.3d 968, 975 (7th Cir. 2003); *Guardian Indus. Corp. v. NLRB*, 49 F.3d 317, 318 (7th Cir. 1995). The critical question is whether the employer is discriminating against union messages, or if it has a neutral policy of permitting only certain kinds of postings (for example, those related directly to work rules). Discriminatory interference with union organizers' access to bulletin boards is forbidden. *Fleming*, 349 F.3d at 975; *J.C. Penney Co., Inc. v. NLRB*, 123 F.3d 988, 997 (7th Cir. 1997).

Though it is undisputed that Loparex's new bulletin board policy was facially neutral and nondiscriminatorily applied, an employer may violate the Act if its motivation for a new policy is its hostility toward prounion activity. See *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1365-66 (7th Cir. 1983) (finding the employer's adoption of a rule was motivated by an antiunion position and thus violated the Act); *Brandeis Machinery & Supply Co. v. NLRB*, 412 F.3d 822, 834-35 (7th Cir. 2005) (explaining that under section 8(a)(1), facially nondiscriminatory "policies may not target, either through *design* or enforcement, activity protected by the Act") (emphasis added); see also *NLRB v. Wolfe Electric Co.*, 314 F.3d 325, 328 (8th Cir. 2002); *Four B Corp. v. NLRB*, 163 F.3d 1177, 1184 (10th Cir. 1998); *Roadway Exp., Inc. v. NLRB*, 831 F.2d 1285, 1290 (6th Cir. 1987).

If an employer is alleged to have acted with an antiunion purpose, we apply the analytical framework set forth by the Board in *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980). See *FedEx Freight East, Inc. v. NLRB*, 431 F.3d 1019, 1027-28 (7th Cir. 2005); *Roadway Exp.*, 831 F.2d at 1290. Under *Wright Line*, the Board must make a *prima facie* showing that "antiunion animus was a substantial or motivating factor in the employer's decision." *NLRB v. Joy Recovery Technology Corp.*, 134 F.3d 1307, 1314 (7th Cir. 1998). Once the Board does so, the burden shifts to the employer to prove that it had a legitimate business reason for making its decision. *Id.* Since Loparex did not offer any explanation for why it adopted the new bulletin board policy, the case hinges on whether the Board adequately proved its *prima facie* case.

In determining whether an employer acted improperly, the Board is entitled to rely upon circumstantial evidence. See *SCA Tissue North America LLC v. NLRB*, 371 F.3d 983, 988-89 (7th Cir. 2004). In concluding that Loparex was opposed to the unionization campaign, the ALJ focused on a series of events that took place during the months leading up to Loparex's announcement of the bulletin board policy. In January or February of 2007, Schillinger, a production operator at the plant, spoke with Randy Risler, who worked in human resources, about the employees' dissatisfaction with newly enacted attendance and pay policies. *Id.* at 104. Schillinger was someone Risler knew. In 2006, Schillinger had been fired by Douglas-Hanson, the previous owner of the plant, for his union organizing activity, but he had recently been reinstated pursuant to the settlement of an unfair labor practices charge. In early February 2007, a week after Schillinger's conversation with Risler, Todd Bloom and Jason Carlson, both supervisors and former Douglas-Hanson employees, called Schillinger into an office to discuss what Schillinger said to Risler. After questioning Schillinger, Bloom called in Risler and Lisa Koats, the human resources manager. At some point in the conversation, Schillinger pointed out that everyone in the room knew his history of union organizing, and Koats responded, "That's all water under the bridge." Schillinger then asked what he should do if people asked him about unionization and Koats said, "[Y]ou're to just work and not talk about the Union."

Beginning in early February 2007, prounion activity at the Hammond plant slowly began to increase. Schillinger

started to wear union buttons and hats to work, and he donned a union t-shirt for about half of his workdays. On March 9, 2007, a group of employees posted a prounion flyer on one of Loparex's many company bulletin boards. The flyer was taken down shortly after it was posted; thereafter, it was repeatedly reposted and taken down. The record does not reveal when these postings and re-postings took place, or how many times the flyer was replaced, and so we cannot tell whether the flyer was displayed on the company bulletin board after March 9.

These events support the Board's conclusion that Loparex was motivated by antiunion animus when it enacted its bulletin board policy. Schillinger's discussion of unions with Loparex's management and his prounion apparel put the company on notice that union organizing efforts at the plant had (re)commenced. Loparex points out that there is no evidence indicating that the company knew that union activists had placed a flyer on one of the many bulletin boards in the plant. Nonetheless, the Board was aware that this was a relatively small plant. In addition, it was entitled to rely on the suspicious timing of the policy announcement, immediately after a three- or four-month period in which Loparex witnessed an uptick in employees' organizing efforts. *Cf. Brandeis Machinery & Supply Co. v. NLRB*, 412 F.3d 822, 835 (7th Cir. 2005); *Great Lakes Warehouse Corp. v. NLRB*, 239 F.3d 886, 890 (7th Cir. 2001); *NLRB v. Rain-Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir. 1984).

The inference of an antiunion purpose is reinforced by the hostility Loparex's management displayed toward

Schillinger at the February 2007 meeting. The Board, affirming the ALJ, reasonably viewed the circumstances leading to the meeting as suspect. Presumably, Risler had already tipped off management about Schillinger's opposition to the new policies and thus there was little reason to interrogate Schillinger about his conversation with Risler. The management officials who called the meeting had worked at Douglas-Hanson when Schillinger was fired for his union activity. By warning Schillinger at the end of the meeting not to speak about the union, Koats came dangerously close to illegally prohibiting an employee from engaging in prounion solicitation during the workday. See *NLRB v. Aluminum Casting & Engineering Co.*, 230 F.3d 286, 293-94 (7th Cir. 2000) (holding an overbroad no-solicitation rule may improperly send the message that employees cannot discuss unions during break times). We see no reason to second-guess the Board's conclusion that the meeting revealed management's distaste for a union.

B.   Distribution of Union Literature in the Parking Lot

In May or early June 2007, Schillinger, Chris Meeker and two other employees handed out literature to co-workers in the company parking lot and placed union literature on car windshields. Shortly after they got started, three Loparex officials came out to the parking lot and informed them that they were violating company policy. The Board endorsed the ALJ's conclusion that Loparex's restriction on union organizing in the company parking lot constituted an unfair labor practice under section 8(a)(1).

In protecting employees' right to organize, section 8(a)(1) of the Act recognizes that employees' organizing activities may substantially interfere with employers' property rights. See *St. Margaret Mercy Healthcare Centers v. NLRB*, 519 F.3d 373, 374 (7th Cir. 2008). Thus, while the Act grants employees the right to solicit on behalf of a unionization campaign, the statute also recognizes the employer's interest in maintaining productivity and discipline. See *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 113 (1956). An employer, for example, is entitled to limit or ban solicitation in the workplace during work time. See *NLRB v. Clinton Electronics Corp.*, 284 F.3d 731, 739 (7th Cir. 2002) (citing *Republic Aviation v. NLRB*, 324 U.S. 793 (1945)).

An employer may not, however, prohibit all solicitation in a company parking lot. Loparex contends that this is not what it was doing; instead, it argues, it only banned the practice of placing flyers on car windshields. The Board saw matters differently; it agreed with the ALJ's finding that the Loparex officials were telling the employees that they could not distribute any union materials in the parking lot even if they were off-duty. Because the record provides some support for both positions, this was a classic call for the Board. *Cf. NLRB v. Aluminum Casting & Engineering Co.*, 230 F.3d 286, 293-94 (7th Cir. 2000); *Beverly California Corp. v. NLRB*, 227 F.3d 817, 839-40 (7th Cir. 2000).

We add that even if Loparex had proscribed only distribution on car windshields, the Board still could have found that its policy violated section 8(a)(1). *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1365-66 (7th Cir. 1983). In

*Village IX*, we concluded that an employer engaged in an unfair labor practice when it barred several employees from placing leaflets under the windshield wipers of cars parked in the company lot. *Id*. We explained that "the distribution [of leaflets] could not have disrupted the company's work" and "would not have interfered with the owners' property right except in the most technical of senses." *Id.* at 366. Loparex's alleged concern that distribution on cars would lead to "wholesale littering" lacks merit. This concern was never mentioned by company officials and there is no evidence indicating that litter would have been a problem.

C.  Distribution of Union Buttons in the Lunch Room

In June 2007, Meeker left a pile of prounion buttons lying on a table next to a time clock. On June 20, Todd Dennison and Lisa Koats, both members of Loparex's management team, held a meeting with Meeker, Schillinger, and another employee about their distribution of the buttons. Dennison warned, "I don't want to catch you passing [buttons] out, Okay, I don't want to see them laying around. . . . You can pass them out when you're outside, on your own time, but when you're here working, you, you, need to be working." The ALJ concluded, and the Board agreed, that the prohibition was overbroad because employees could have believed they were barred from soliciting near the time clock, a non-work area, during non-working hours.

Loparex comes close to conceding that such an expansive rule against solicitation on company property would

violate section 8(a)(1). Our review satisfies us that the Board's position finds support in the evidence. See *Aluminum Casting*, 230 F.3d at 293-94. Loparex defends itself in this instance by trying to characterize Dennison's statement as an anti-clutter order. Company officials, it says, are permitted to forbid employees from leaving unattended piles of buttons on company property. Once again, the question is whether an otherwise reasonable policy operates in practice in a way that discriminates against union organizers. See *Fleming Companies, Inc. v. NLRB*, 349 F.3d 968, 975 (7th Cir. 2003). Loparex contends that its prohibition was nondiscriminatorily applied, and it asserts that company officials were acting within their rights in banning the use of company property to distribute union buttons.

Loparex's argument on this point is terse and largely unsupported by pertinent authority, and so we were concerned that it might be forfeited. See *White Eagle Co-op Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009). Loparex does, however, refer us to a case that directly addresses the company-property issue. See *Guard Publishing*, 351 NLRB 70 (2006), *enf'd in part*, 571 F.3d 53 (D.C. Cir. 2009). The Board argues that Loparex cannot invoke *Guard Publishing* because it failed to raise the case before the Board properly. See *Production Workers Union of Chicago v. NLRB*, 161 F.3d 1047, 1054 (7th Cir. 1998) (explaining that appellate court cannot review an argument first raised on appeal unless "extraordinary circumstances" are present). Loparex did, however, present its company-property argument in its opening brief before the Board. This is enough to preserve the point in these enforcement

proceedings and to allow Loparex to rely on this theory even though the particular case was first mentioned in its reply brief.

Nevertheless, this is of no help to Loparex. The Board affirmed the ALJ's finding that the no-distribution rule was overly broad, because Dennison and Koats did not state that they were disallowing distribution only in work areas of the facility. By purporting to restrict distribution in non-work areas, during break times, they stepped over the line. In so finding, the Board was following long-established policy to the effect that "a rule is presumptively invalid if it prohibits distribution on the employees' own time." See *Our Way, Inc.*, 268 NLRB 394, 394 (1983). The ALJ also noted that at the same time Loparex was complaining about the union materials, it permitted the distribution in the lunchroom of some coupons for a local fast-food restaurant, suggesting that its real concern was neither clutter nor limitation to job-related materials.

D.  Shift Leaders as Supervisors under the Act

In June or July 2007, Loparex announced to the shift leaders working at the Hammond plant that they were "supervisors" within the meaning of the Act and thus prohibited from engaging in union activities. See *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 708 (2001). Section 2(11) of the Act states:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire,

transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). To prove that employees qualify as statutory supervisors, an employer has the burden to prove: "(1) [the employees] hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their 'exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment,' and (3) their authority is held 'in the interest of the employer.'" *Kentucky River*, 532 U.S. at 713 (citation omitted). Loparex argues that shift leaders qualify as supervisors because they have the authority to responsibly direct employees and assign them work.

Before we address each of these contentions, it is helpful to provide a general description of the role shift leaders play at the Hammond plant. Each shift leader is part of a small crew typically comprised of five or so workers. Shift leaders work directly under a team manager, who is generally assigned to the same 12-hour shift. While shift leaders, like other crew members, operate the production machinery, they also help out other crew members, answer questions, and provide needed supplies. In addition, shift leaders are required to assign crew members to various machines in order to accomplish the tasks allocated to the crew in the daily job priority sheet.

1.  Authority responsibly to direct

To establish that an employee has the authority responsibly to direct another co-worker, the employee must be accountable for the co-worker's performance. See *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.3d 723, 728 (7th Cir. 1977). In addition to accountability, the Board requires that an employee must have "authority to take corrective action, if necessary" and be subject to negative consequences for her failure to take such action. *Oakwood Healthcare, Inc.*, 348 NLRB 686, 692 (2006). The Board adopted the ALJ's conclusion that Loparex's shift leaders were not empowered to take corrective action.

Loparex argues that *Oakwood Healthcare* was wrongly decided because the Board inappropriately read into the statute an additional requirement that the employee must have the capacity to take corrective actions. The Board asserts that Loparex has forfeited any argument directly challenging the case. See 29 U.S.C. § 160(e). While Loparex argued to the Board that its shift leaders did direct their co-workers, it neither attacked *Oakwood Healthcare* nor raised the issue of corrective action. This may well amount to a forfeiture of Loparex's argument on appeal. See *Masiongale Electrical-Mechanical, Inc. v. NLRB*, 323 F.3d 546, 555 (7th Cir. 2003). Yet even if Loparex did preserve the issue, we are unpersuaded by its argument.

The Board's position, in Loparex's opinion, is nonsensical, because the ability to discipline is a statutorily recognized supervisory power. Assuming that "corrective action" is not different from disciplinary action, Loparex

argues that the *Oakwood Healthcare* rule effectively elimi-nates "responsible direction" as a separate basis for establishing an employee's supervisory status. Loparex contends that the Board applied the "corrective action" requirement in a manner that conflated the idea of disci-pline and responsible direction.

The most we can say is that the reference to responsible direction in section 2(11) of the Act may be ambiguous. We thus owe *Chevron* deference to the Board's decision in *Oakwood Healthcare*. See *Chevron U.S.A., Inc. v. National Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984); *NLRB v. GranCare, Inc.*, 170 F.3d 662, 666 (7th Cir. 1999) (*en banc*) (according *Chevron* deference to Board's interpretation of the "independent judgment" requirement in section 2(11)). Though Loparex contends that *Oakwood Healthcare*'s concept of "corrective action" is fundamentally flawed, we find it a permissible interpretation of the pertinent statutory language. The Board is entitled to take the position that it would be incongruous to hold someone accountable for the conduct of others she could not control or correct. See *NLRB v. Don's Olney Foods, Inc.*, 870 F.2d 1279, 1284 (7th Cir. 1989) (holding that responsible direc-tion implies the need for accountability).

At the same time, in applying the "corrective action" requirement, the Board must be careful to distinguish between corrective and disciplinary action in order to ensure that each part of section 2(11) has meaning. Yet, despite Loparex's claims to the contrary, there is little indication that it equated these two forms of supervisory power. Instead, the Board accepted the ALJ's finding that

shift leaders lacked authority to take corrective action because they were unable to control their crew members in any meaningful sense. The ALJ pointed out, for example, that if a member of a shift leader's crew is insubordinate, the shift leader's only option is to submit a factual report detailing the issue to her team manager for consideration. The ALJ found that this meager reporting power could not be construed as a form of corrective action.

Since Loparex did not provide any other evidence indicating that shift leaders had authority to control crew members, the Board did not need to illustrate the difference between corrective and disciplinary action. We add that we have no trouble imagining separate domains for these two kinds of action. For instance, an employee might be said to take corrective action if she requires a co-worker to stay late to complete a project that has fallen behind schedule. Placing this small burden on the employee, however, would not amount to a disciplinary action that could affect the employee's job status.

We are satisfied that substantial evidence supports the Board's determination that shift leaders do not possess the ability to take corrective action. This court owes deference to the Board when it is engaged in the difficult task of distinguishing between "true supervisors" and other employees under section 2(11). See *GranCare*, 170 F.3d at 666. This type of line-drawing is what the Board is for, after all. And the evidence in this case provided ample support for the Board's conclusion that shift leaders lack the authority responsibly to direct their crew members.

    2.   Authority to assign

While the Board assumed that shift leaders had the authority to assign work to crew members, it also concluded that shift leaders did not exercise independent judgment while assigning the work. See *Kentucky River*, 532 U.S. at 713 (distinguishing "independent judgment" from the exercise of authority that is "merely routine or clerical [in] nature"). In applying the concept of independent judgment, the Board focused on the manner in which shift leaders assign work to their crew members. The shift leaders refer to the daily priority sheet, which "lists the jobs to be run on each machine in order of importance and when those jobs are due." Only two shift leaders testified about their specific approach to assignments. Meeker reported that he used three basic strategies: (1) making sure people rotated to different machines; (2) allowing a person to continue working on the same machine if a project took more than a day; and (3) random assignment. Meeker did not take into account the personal characteristics of his co-workers when assigning work. Tim Monicken had a different system: he assigned higher priority work to more efficient workers. The Board gave no weight to Monicken's testimony, however, because he was no longer a shift leader at the time of the hearing and he never professed to speak about how other shift leaders assigned work. Left with a meager record showing only Meeker's approach to assigning work, the Board decided that this was not a position that required the exercise of independent judgment.

Loparex contends that the Board should not have ignored Monicken's testimony. Yet Loparex is unable to point to any evidence that any other shift leaders adopted Monicken's practice of assigning work based upon workers' relative productivity. In fact, the ALJ specifically found that Monicken's job as shift leader differed in many respects from other shift leaders. Since Loparex had the burden to demonstrate independent judgment, we conclude that substantial evidence supports the Board's decision to focus on Meeker's approach to work assignments.

Retreating to Meeker's testimony, Loparex contends that it is irrelevant that Meeker failed to exercise independent judgment. As long as Meeker was empowered to make independent judgments about work assignments, Loparex asserts that he qualifies as a supervisor under section 2(11). *Cf. Dreyer's Grand Ice Cream, Inc. v. NLRB*, 140 F.3d 684, 687 (7th Cir. 1998) (collecting cases that hold that the actual exercise of supervisory power is not necessary to qualify as a supervisor under section 2(11)). While it is possible that a statutory supervisor need only have the authority to exercise one of the supervisory powers enumerated in section 2(11), this does not suffice for the exercise of independent judgment. See *NLRB v. Don's Olney Foods, Inc.*, 870 F.2d 1279, 1283-84 (7th Cir. 1989). In *Don's Olney Foods*, even though an employee had the ability to assign workers to different tasks, we found this authority insufficient because most of the assignments were dictated by informal routine. *Id.* Similarly, Meeker's method of assignment was routine and clerical in nature; therefore, the Board acted within its

authority when it concluded that Loparex's shift leaders did not exercise the requisite independent judgment to qualify as supervisors under the Act.

* * *

We conclude that the Board's order should be ENFORCED in its entirety.