In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3300

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

and

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL &
SERVICE WORKERS INTERNATIONAL UNION,

*Intervening-Petitioner,*

*v.*

KSM INDUSTRIES, INC.,

*Respondent.*

Application for the Enforcement of a Supplemental Order
of the National Labor Relations Board
Nos. 30-CA-13762, 14008, 14101.

ARGUED SEPTEMBER 20, 2011—DECIDED MAY 22, 2012

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* The present case arose against the
backdrop of an order from the National Labor Relations

Board finding that KSM Industries violated sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) and (1), when it denied or delayed the recall of certain employees after their participation in an unfair labor practices strike. See *KSM Indus., Inc.,* 336 N.L.R.B. 133 (2001), *motion for reconsideration granted in part on other grounds*, 337 N.L.R.B. 987 (2002). After further proceedings, the Board ordered KSM to pay specific amounts of backpay to 42 affected employees. (See Appendix to this opinion.) It now petitions this court to enforce that order. KSM challenges the Board's findings on 11 employees for lack of substantial evidence. As KSM offers no argument with respect to the other 31 employees, we enforce the Board's order summarily with respect to them. The employees' union intervened to defend the Board's order. We also grant the Board's petition for enforcement for the 11 employees for which KSM has raised objections.

# I

The Administrative Law Judge (ALJ) and the Board wrote thorough decisions that provide extensive detail about this saga, so we have no need to repeat everything here. *KSM Indus., Inc. and United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union Local 2-779, AFL-CIO*, 353 N.L.R.B. No. 117 (2009). A brief account of the salient facts will suffice.

KSM's current liability arose out of its failure fifteen years ago to reinstate its strikers after the employees'

union made an unconditional offer to return to work on October 5, 1997. In 2001, the Board ruled that KSM's conduct with respect to recalls violated the labor laws, and it ordered backpay as a remedy. 336 N.L.R.B. 133 (2001). The parties entered into a partial settlement agreement on October 3, 2006, but further progress was not forthcoming. The ALJ attempted to wrap matters up with a remedial order entered on September 27, 2007, but by the time this order reached the Board, the Board had shrunk to two sitting members, who attempted to resolve it. At that point, the case was held up for a year and a half by *New Process Steel, L.P. v. NLRB,* 130 S. Ct. 2635 (2010), which ultimately held that the Board could not act without a minimum of three members. After the Board once again had the necessary quorum, it issued a Second Supplemental Decision and Order in September 2010 requiring KSM to compensate 42 former striking employees with backpay totaling in the aggregate $383,461.11. That is the order now before us.

## II

Our review of the Board's decision is subject to a deferential standard. *Loparex LLC v. NLRB*, 591 F.3d 540, 545 (7th Cir. 2009). Our task is not to reweigh the evidence; it is only to determine whether there is evidence in the record supporting the Board's outcome that could satisfy a reasonable fact finder. *NLRB v. Midwestern Pers. Serv.*, 508 F.3d 418, 423 (7th Cir. 2007). We owe "particular deference to the Board's credibility determinations, which we will disturb only in extraordinary circum-

stances." *FedEx Freight East, Inc. v. NLRB*, 431 F.3d 1019, 1026 (7th Cir. 2005) (quoting *Ryder Truck Rental v. NLRB*, 401 F.3d 815, 825 (7th Cir. 2005)). We similarly defer to the Board's interpretations of the law "unless they are irrational or inconsistent with the Act." *Loparex*, 591 F.3d at 545. In a case like this one, where the Board adopted the majority of the ALJ's findings, we apply the same standards to the ALJ's findings and opinions to the extent that the Board has adopted them as its own. *Id.*

In the face of these deferential standards, KSM has offered a number of reasons why, in its view, we should deny enforcement to the Board's order. Initially it argues that the Board denied it due process because the Board made its decision too quickly. This may strike the reader as odd, given the fact that the case (if it were a child) has gone from birth to high school, but KSM's focus is more narrow. KSM sought review of the original Supplemental Decision and Order issued by the two-person panel on March 26, 2009, 353 N.L.R.B. 1124 (2009), in the D.C. Circuit. *Id.* That court, however, suspended its ruling pending the Supreme Court's decision in *New Process Steel*, which raised the question whether the Board was empowered to act through only two members. The Supreme Court answered this question in the negative, holding that two Board members cannot constitute a statutory quorum (even though a three-person Board might act by a vote of 2-1). This had the effect of setting aside a great number of decisions, including the 2009 ruling in this case. The Board sought expedited issuance of the remand from the D.C. Circuit,

and that court obliged with an order dated September 29, 2010. The Board issued its Second Supplemental Decision and Order the following day, on September 30. KSM alleges that the speed with which the Board issued its second decision after the remand proves that the Board failed properly to review the matter.

Whatever one might think of the Board's one-day turn-around is, unfortunately for KSM, beside the point. We lack authority to reach the merits of this argument because KSM did not raise it before the Board. 29 U.S.C. § 160(e); 29 C.F.R. § 102.48(d)(1), (2) (moving party has 28 days after the Board issues its decision to request reconsideration). Section 160(e) states, "No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extra-ordinary circumstances." KSM has not suggested any reason why we should find the requisite extraordinary circumstances. *NLRB v. Dominick's Finer Foods, Inc.*, 28 F.3d 678, 686 (7th Cir. 1994) (explaining that "extra-ordinary circumstances" under § 160(e) exist "only if there has been some occurrence or decision that prevented a matter which should have been presented to the Board from having been presented at the proper time").

We add that even if we thought that KSM's forfeiture of this point was excused, its underlying argument is without merit. The pendency of *New Process Steel* was hardly a secret, and for all we know the Board was already busy taking another look at the cases that were

potentially affected by it. KSM has offered no evidence to show that the Board failed to fulfill its obligations. It takes much more for us to intervene than a disappointed party's hunch that the Board gave a cursory review to its case.

## III

We now turn to KSM's assertion that the Board improperly awarded backpay to 11 employees. KSM takes issue with the Board's conclusion that certain employees who quit in order to obtain access to their 401(k) funds did not intend permanently to abandon employment and thus are owed backpay. It also challenges the Board's findings that certain employees adequately searched for and attempted to secure interim employment.

### A

#### 1

The first question presented is whether five striking employees who resigned during the strike because they needed to gain access to their 401(k) accounts—to whom the parties refer as the "401(k) quits"—were properly awarded backpay by the Board. This is important because if a striker intends permanently to abandon his employment when he resigns during a strike, the employer may avoid backpay liability. *L.B.&B. Assoc., Inc.*, 346 N.L.R.B. 1025, 1029 (2006). KSM challenges the Board's finding that Anthony Bannenberg, Alan Resch,

and Michael Bartelt did not intend permanently to abandon their employment when they resigned. KSM also argues that Robert Graf and Douglas Wiedeman, both of whom resigned after the strike, also intended permanently to abandon their employment.

The Board announced its legal standard for 401(k) quits who resign during a strike in *Augusta Bakery Corp.*, 298 N.L.R.B. 58 (1990), *enforced* 957 F.2d 1467 (7th Cir. 1992); since that time, it has adhered to that decision. *L.B.&B. Assoc., Inc.*, 346 N.L.R.B. at 1029. An employer bears the burden of producing "unequivocal evidence" of a striker's intent to "permanently sever" the employment relationship, if it wishes to establish abandonment and thus to avoid backpay liability. *Augusta Bakery*, 957 F.2d at 1474-75 (quoting *Harrowe Servo Controls*, 250 N.L.R.B. 958, 964 (1980)). For 401(k) quits, the Board weighs the following factors: whether (1) the striking employees could obtain their retirement contributions only by quitting; (2) they continued to participate in the strike after they resigned; (3) they credibly testified to economic stress; (4) they did not have other employment when they resigned; and (5) they did not tell their employer that they found other employment. *Id.* at 1476; see also *Sever v. NLRB*, 231 F.3d 1156, 1168-69 (9th Cir. 2000).

The Board uses a slightly different standard if the workers resign after the strike and after the employer initiates an unlawful reinstatement system. *Alaska Pulp Corp.*, 326 N.L.R.B. 522, 525 n.17 (1998). Under such circumstances, the Board is "unable to determine, under the

subjective standards set forth in *Augusta Bakery*, whether the strikers unequivocally intended to abandon their prestrike or substantially equivalent positions because the [employer's] refusal to offer full and timely reinstatement so tainted the atmosphere in which they resigned." *Id*. The Board resolves this uncertainty against the employer. *Id*.; see also *Roman Iron Works, Inc.*, 292 N.L.R.B. 1292, 1301-02 (1989).

In this case, the ALJ did not go so far as to find that resigning was the only way for employees to obtain access to their 401(k) funds. The alternative to resignation was a procedure called "hardship withdrawal" available as part of KSM's 401(k) program. The ALJ found, however, that the resignation and hardship-withdrawal routes were not equal because there were harsher limits on hardship withdrawals. In particular, the ALJ found that even though hardship withdrawals were permitted under the program, they were limited to distributions for four specified necessities: medical expenses, the purchase of a primary residence, post-secondary tuition and fees, and prevention of foreclosure or eviction from a primary residence. Such hardship withdrawals were subject to a 20% federal tax and a penalty for early withdrawal. Critically, the ALJ made no finding supporting KSM's position that some or all of the strikers would have received hardship withdrawals, even prior to the strike. To the contrary, the ALJ mentioned at several points that Administrative Manager Dave Oechsner told several people that the only way to reach those funds was to resign. KSM fails to present any evidence challenging

these conclusions and, finding none ourselves, we do not disturb the Board's finding.

After reviewing the record as a whole, we are satisfied that substantial evidence supports the finding that the five employees did not intend to abandon their employment permanently. The ALJ's findings with respect to these people were largely based on credibility determinations. We owe "particular deference to the Board's credibility determinations, which will be disturbed only in extraordinary circumstances." *FedEx*, 431 F.3d at 1026. KSM offers no evidence from the record that would justify such a finding.

## 2

KSM presents an alternative challenge to the award of backpay to the 401(k) quits by arguing that the federal tax code and the treasury regulations do not allow 401(k) distributions upon resignation unless the employee, in fact, resigns. ERISA is also implicated, as KSM sees it, because it believes that the Board's order would require it to breach its fiduciary duty to permit distributions only when authorized by plan documents. KSM claims that the Board's order "presents employers with a significant legal dilemma" forcing it to choose between violating federal tax and ERISA law, and violating the Act.

KSM's arguments in this respect are not well taken. Not only are the cases it cites irrelevant, *Kennedy v. Plan Adm'r for DuPont Sav. & Invest. Plan*, 555 U.S. 285 (2009) (outlining general ERISA duties), *Egelhoff v. Egelhoff*, 532

U.S. 141 (2001) (reviewing a conflict between ERISA and state law), but pertinent Board case law supports the opposite conclusion. The Board has considered and rejected similar challenges based on the federal tax code and ERISA in the past. *Nat'l Fuel Gas Distrib. Corp.*, 308 N.L.R.B. 841 (1992) (dismissing an employer's concern that the order violates the federal tax code without concern for the potential "significant financial costs" it may cause the employer); *Truck Drivers Union Local 164*, 274 N.L.R.B. 909 (1985) (ruling against the employer because nothing in the record established that the order would cause the relevant plan to lose tax-exempt status or otherwise violate ERISA or the tax code). The question whether an employee intended permanently to abandon employment is a factual question distinct from the question whether an employee resigned for tax or ERISA purposes. We note in this connection that KSM's argument cites only general, definitional materials from the tax code and Treasury Regulations; it points us to no regulation, Revenue Ruling, or other authoritative statement addressing the particular situation before us. Without further serious development of the point, we have no reason to consider it further.

We therefore enforce the Board's order that Bannenberg, Bartelt, Graf, and Resch are entitled to backpay in the amounts provided by the Board. We return to Wiedeman in parts D and E below; at this stage, we comment only that nothing in the arguments addressed in this section undermine his right to relief.

## B

The next question is whether KSM owes backpay to certain employees who the Board found reasonably delayed or reasonably engaged—albeit unsuccessfully—in searches for interim employment: Laverne Jung, Hans Eusch, and James Malson.

An employee's search efforts do not necessarily need to start immediately upon the unlawful discharge, particularly when the company "engage[s] in . . . conduct that would warrant . . . optimism about the prospect of reinstatement." *Grovner Orlando Assoc.*, 350 N.L.R.B. 1197, 1200 (2007). The Board found that Jung reasonably did not initiate a job search while waiting to be reinstated. The Union submitted to KSM an unconditional offer to return on October 5, 1997. On or about October 16, KSM distributed a letter to former strikers inquiring about their availability for recall. The Board deemed this letter by KSM to be "conduct that would warrant . . . optimism about the prospect of reinstatement." *Grovner*, 350 N.L.R.B. at 1200. On November 14, 1997, Jung received a recall letter offering him reinstatement starting on December 1 of that year. The Board's determination was a finding of fact that KSM fails to challenge with contrary evidence. The reasonableness of Jung's conduct is confirmed by the fact that he was offered reinstatement only one month after KSM's inquiry letter.

The Board also found that Eusch and Malson reasonably engaged in searches for interim employment. Board precedent places on KSM "the ultimate burden of persuasion" on the question whether the unlawfully

discharged employee adequately searched for interim employment. *St. George Warehouse*, 351 N.L.R.B. 961, 961 (2007), *enforced* 645 F.3d 666 (3d Cir. 2011). After the employer proves that there were "comparable jobs available in the relevant geographic area," the discriminatee and the General Counsel must prove that the discriminatee took "reasonable steps" to get those jobs. *Id*. The General Counsel can satisfy its burden of production by offering the employee's credible testimony or other reliable evidence that the employee made an "honest good faith effort" to find a job. *NLRB v. Midwestern Pers. Serv., Inc.*, 508 F.3d 418, 423 (7th Cir. 2007).

The ALJ found that KSM failed to show that there was comparable work available for Eusch in the relevant geographic area for the period during which he lacked employment: December 1, 1997, to February 8, 1999. On review, the Board tolled Eusch's backpay period from August 1998 to January 1999 because of his weak efforts to search for work then. KSM argues that Eusch should be denied backpay for the full period, not just the omitted two quarters, because companies similar to KSM were hiring KSM strikers. KSM misunderstands the "comparable work" standard. The comparison is not between companies, but between jobs. KSM has not shown whether there was work available for tape operators, Eusch's specialty.

We are similarly unpersuaded by KSM's challenge to Malson's backpay award. Malson's backpay period runs from October 5, 1997, to April 22, 1998. The Board found that Malson satisfied his burden by registering with the

state unemployment agency. It accepted his explanation for his three-month delay in searching for work; he testified that he reasonably believed he would be reinstated. Board precedent establishes that "[t]he receipt of unemployment compensation pursuant to the rules regarding eligibility constitute *prima facie* evidence of a reasonable search for interim employment." *Taylor Mach. Prod.*, 338 N.L.R.B. 831, 832 (2003) (internal citations and quotations omitted). KSM has not succeeded in undermining the Board's decision to credit Malson's account. We thus also enforce the Board's order with respect to the backpay obligations owed to Jung, Eusch, and Malson.

## C

KSM has another theory that it believes defeats the claims of Thomas Cooper, Lawrence Wetzel, and Allen Curtis: these men, it argues, voluntarily quit interim employment without reasonable justification. If an employee voluntarily quits his interim employment without a good reason, the Board will limit his backpay because of his failure to mitigate damages. *NLRB v. Pepsi Cola Bottling Co. of Fayetteville, Inc.*, 258 F.3d 305 (4th Cir. 2001). When an employee quits the interim employment, "the burden shifts from the [company] to the Government to show that the decision to quit was reasonable." *First Transit, Inc.*, 350 N.L.R.B. 825, 826 (2007). The Board will find an employee's decision to quit reasonable if the job exposes him to "increased exposure to environmental hazards or more onerous conditions." *Parts Depot, Inc.*, 348 N.L.R.B. 152, 154 n.16 (2006).

The ALJ found that Cooper quit his interim employment because of hazardous working conditions; Wetzel, who was preparing for retirement, switched interim employment positions to gain access to a better retirement package; and Curtis switched interim employment positions to avoid harsh work conditions and to accept a position that was more comparable to his work at KSM. The Board found each of these reasons reasonable and justified by the circumstances. The ALJ's findings with respect to these three employees were based on substantial evidence in the record and are not convincingly challenged by KSM.

D

KSM has also challenged the Board's award of back-pay to Wiedeman on the ground that Wiedeman lost two interim employment positions for behavior that amounted to deliberate and gross misconduct. If an employee's interim employment is involuntarily terminated, the Board will not find willful loss of employment unless the employee has engaged in "deliberate and gross misconduct, which is so outrageous that it suggests deliberate courting of discharge." *Cassis Mgmt. Corp.*, 336 N.L.R.B. 961, 967 (2001). For example, in *Ryder Systems* the Board held that an employee did not willfully lose employment when he was discharged for missing "several scheduled deliveries." 302 N.L.R.B. 608, 610 (1991). The Board explained that he did not engage in conduct "involving moral turpitude and his conduct was not otherwise so outrageous as to suggest deliberate

courting of discharge." *Id*. The Board has "repeatedly held that a discharge based on poor work performance does not constitute a willful loss of earnings." *Ernst & Young*, 304 N.L.R.B. 178, 180 (1991).

The ALJ found that Wiedeman's employment at Troyk Printing was terminated for "misconduct." Wiedeman explained that he did not get along with a colleague. Even though the ALJ deemed the explanation vague, he reminded the parties that it was KSM's burden to show that his conduct amounted to "deliberate and gross misconduct." The ALJ concluded that KSM had not met its burden. The Board also found that Wiedeman's employment as a security guard was terminated for attendance problems. It credited Wiedeman's explanation that his truck repeatedly broke down. In the end, the ALJ found that KSM did not produce any additional evidence to establish that his conduct was bad enough to justify a finding of "deliberate and gross misconduct."

E

KSM finally offers a third argument for setting aside Wiedeman's backpay order; that it did not unlawfully replace Wiedeman with non-unit employees. (KSM's persistence in this respect may have something to do with the fact that Wiedeman was granted one of the highest awards by the Board; see the Appendix to this opinion.)

The Board deems it "settled" that an employer violates the Act when it fails immediately to reinstate strikers

following their unconditional offer to return to work, "unless the employer establishes a legitimate and substantial business justification for failing to do so." *In Zimmerman Plumbing & Heating Co.*, 334 N.L.R.B. 586, 588 (2001). A legitimate and substantial business justification is a "*bona fide* absence of available work" for a striker for his pre-strike position or a "substantially equivalent" job. *Id*. The employer bears the burden of establishing this affirmative defense. *Radio Elec. Serv. Co.*, 278 N.L.R.B. 531, 532 (1986). The employer cannot make work unavailable by transferring it to non-unit workers. *Super Glass Corp.*, 314 N.L.R.B. 596, 596 n.1 (1994). An employer may, however, transfer the work to previously reinstated strikers without triggering a vacancy. *Randall, Burkett/ Randall, Div. of Textron, Inc.*, 257 N.L.R.B. 1, 4 (1981).

The ALJ found that Wiedeman's stockroom duties were performed by two supervisors and a recalled striker. Because the majority of Wiedeman's job was performed by the two non-unit workers, however, this arrangement did not undermine Wiedeman's rights. With respect to the recalled striker, the ALJ found that KSM "was not privileged to recall a general factory employee after the strike was over and have him and two supervisors perform the job that was the prestrike job of an unrecalled and unreplaced stock and receiving employee." KSM argues that its stockroom work was legitimately unavailable for Wiedeman, but once again it has not presented enough to overcome the Board's findings. When all is said and done, therefore, we enforce the Board's order granting backpay to Wiedeman.

**IV**

The final issue before us is whether the Board properly found that KSM should have recalled its workers using a seniority-based system, rather than the merit-based system that KSM preferred. The Board's primary objective when choosing a reinstatement system is "to restore, to the extent feasible, the status quo ante by restructuring the circumstances that would have existed had there been no unfair labor practices." *Parts Depot*, 348 N.L.R.B. at 153. Given that there may be a variety of ways to restore the status quo, the Board grants the General Counsel "wide discretion" in choosing a methodology. *Id*. That said, if the company proposes a different approach, the Board will choose the "most accurate method" between the two alternatives. *The Painting Co.*, 351 N.L.R.B. 42, 49 (2007). The Board will look to the company's past practices and the relative accuracy of each approach to assess the alternatives. *Alaska Pulp*, 326 N.L.R.B. at 523. If the Board is not certain which approach is more accurate, the Board will resolve the uncertainty against the company. *The Painting Company*, 351 N.L.R.B. at 49.

The Board determined that the use of seniority was the most accurate way to restore the status quo because KSM admitted that a seniority system was appropriate for recalling workers immediately at the conclusion of the strike. The Board noted, "[KSM] offers no explanation as to why seniority by job classification is the appropriate method of recall to vacancies at the end of the strike, but not for vacancies that develop subse-

quently." In addition, the Board found that KSM's method of recall was too subjective and informal in light of its unlawful conduct during the relevant time. Even though KSM's witnesses asserted that the merit system had been used in the past, KSM did not produce any documentary evidence to corroborate that contention.

We uphold the Board's choice of the seniority recall system for the reasons it gave.

**V**

For the foregoing reasons, we ENFORCE the Board's order. In the interest of clarity, we have appended to this opinion a list of the affected workers and the amounts of backpay to which each one is entitled.

# Appendix

| Employee | Ordered Relief | Petition for Review | Basis for Petition | | | |
|---|---|---|---|---|---|---|
| | | | 401(k) | Interim Termination | Interim Search | Replacement |
| Gordon John Sabel | $50,981.66 | | | | | |
| Douglas Wiedeman | $48,386.66 | x | x | x | | x |
| Allen M. Curtis | $44,568.11 | x | | x | | |
| Richard J. Kuhlenbeck | $31,841.01 | | | | | |
| Robert A. Graf | $23,393.24 | x | x | | | |
| Hans R. Eusch | $22,019.52 | x | | | x | |
| Alan K. Resch | $16,455.91 | x | x | | | |
| James W. Malson | $16,358.58 | x | | | x | |
| Roger J. Stern | $14,124.03 | | | | | |
| Anthony H. Bannenberg | $14,110.10 | x | x | | | |
| Lawrence H. Wetzel | $13,934.35 | x | | x | | |
| Roger R. Malchow | $11,900.63 | | | | | |
| Brandon Hottenstein | $11,127.75 | | | | | |
| James C. Kollenbroich | $7,392.17 | | | | | |
| Dennis M. Benke | $6,527.49 | | | | | |
| Thomas Cooper | $6,085.65 | x | | x | | |
| Robert J. Hanrahan | $5,311.44 | | | | | |
| Randhall H. Henning | $4,599.01 | | | | | |
| Jesus Rodriguez | $4,474.02 | | | | | |
| Michael A. Servi | $4,318.25 | | | | | |
| Laverne L. Jung | $3,944.33 | x | | | x | |
| Charles J. Peltier | $2,810.90 | | | | | |
| David J. Krull | $2,598.64 | | | | | |
| James C. Roskopf | $2,534.04 | | | | | |
| Harold S. Koslo | $2,110.80 | | | | | |
| Mark W. Rettler | $1,869.98 | | | | | |
| Orin E. Christensen | $1,761.33 | | | | | |
| Michael R. Bartelt | $1,661.31 | x | x | | | |

| Employee | Ordered Relief | Petition for Review | Basis for Petition | | | |
|---|---|---|---|---|---|---|
| | | | 401(k) | Interim Termination | Interim Search | Replacement |
| William J. Peltier | $1,462.67 | | | | | |
| Norbert John Jahn | $847.94 | | | | | |
| Leroy Schmitt Jr. | $763.44 | | | | | |
| Darryl G. Campbell | $716.25 | | | | | |
| Robert C. Green | $457.77 | | | | | |
| Arthur L. Kreis | $446.49 | | | | | |
| Michael Lee Zwieg | $431.13 | | | | | |
| David W. Rosbeck | $342.16 | | | | | |
| Paul J. Gutjahr | $218.05 | | | | | |
| John F. Casetta | $212.16 | | | | | |
| Jeffrey J. Cadeau | $211.85 | | | | | |
| Francisco Guerrero | $110.69 | | | | | |
| Manual Guerrero | $34.50 | | | | | |
| Roger R. Day | $5.00 | | | | | |
| Paul W. Bojar | $0.00 | | | | | |
| Jason R. Day | $0.00 | | | | | |
| Raymond J. Fairbanks | $0.00 | | | | | |
| Roger J. Gutjahr | $0.00 | | | | | |
| Randy A. Habram | $0.00 | | | | | |
| Michael S. Herbst | $0.00 | | | | | |
| Jerome Hoover | $0.00 | | | | | |
| Donald D. Hottenstein | $0.00 | | | | | |
| Ronald L. Hottenstein | $0.00 | | | | | |
| Gaylord E. Krahn | $0.00 | | | | | |
| James Kranz | $0.00 | | | | | |
| Jeffrey J. Mutz | $0.00 | | | | | |
| Jason Sanger | $0.00 | | | | | |
| Anthony D. Schmitt | $0.00 | | | | | |
| David Schneidervin | $0.00 | | | | | |
| Marek A. Synder | $0.00 | | | | | |
| Williams L. Stiggers | $0.00 | | | | | |
| Gerardo Villarreal | $0.00 | | | | | |